**UNITED STATES of America,**
**Plaintiff,**

v.

**William Leonard PICKARD, and**
**Clyde Apperson, Defendants.**

**No. 00–40104–01/02/RDR.**

United States District Court,
D. Kansas.

July 29, 2003.

Gregory G. Hough, Office of United States Attorney, Topeka, KS, for Plaintiff.

William K. Rork, Rork Law Office, Topeka, KS, for defendant William Leonard Pickard.

Mark L. Bennett, Jr., Bennett & Hendrix, LLP, Topeka, KS, for defendant Clyde Apperson.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This matter is presently before the court upon the defendants' motions for new trial and defendant Pickard's renewed motion for judgment of acquittal. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

The defendants were originally indicted on November 8, 2000. They were initially charged with conspiracy to manufacture, distribute and dispense 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD) in violation of 21 U.S.C. § 846. An additional charge of possession with intent to distribute or dispense 10 grams or more of a mixture or substance containing a detectable amount of LSD in violation of 21 U.S.C. § 841(a)(1) was added on January 17, 2001. The trial began on January 13, 2003. The trial concluded on Friday, March 28, 2003. The jury returned a verdict on March 31, 2003. The defendants were found guilty on both charges.

Both defendants have filed a motion for new trial. Pickard has also filed a renewed motion for judgment of acquittal. In his motion for new trial, Pickard asserts that the court erred in approximately 90 ways during the course of this litigation. Apperson raises 59 examples of error by the court in his motion for new trial. Each defendant joins in the issues raised by the other one. The defendants contend that these errors, either singularly or collectively, require a new trial.

In the motion for judgment of acquittal, Pickard raises two arguments. First, he contends that the evidence was insufficient to support the jury's verdict. Second, he argues that the jury failed to give adequate consideration to the evidence and arguments presented because it only deliberated for approximately five hours.

## MOTION FOR JUDGMENT OF ACQUITTAL

 The court shall turn initially to the motion for judgment of acquittal filed by Pickard. In considering a motion for judgment of acquittal, the court must uphold the jury's verdict of guilty if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Haber,* 251 F.3d 881, 887 (10th Cir.) (quoting *United States v. Schluneger,* 184 F.3d 1154, 1158 (10th Cir.1999) cert. denied, 528 U.S. 1080, 120 S.Ct. 800, 145 L.Ed.2d 674 (2000)), cert. denied, 534 U.S. 915, 122 S.Ct. 259, 151 L.Ed.2d 189 (2001). The court "must ask 'only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [defendant] guilty beyond a reasonable doubt.' " *United States v. Magleby,* 241 F.3d 1306, 1311 (10th Cir.2001) (quoting *United States v. Springfield,* 196 F.3d 1180, 1184 (10th Cir.1999), cert. denied, 529 U.S. 1029, 120 S.Ct. 1444, 146 L.Ed.2d 331 (2000)). "Furthermore, 'the evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.' " *Id.* (quoting *United States v. Wood,* 207 F.3d 1222, 1228 (10th Cir.2000)).

In viewing the facts presented at trial in the light most favorable to the government, the court makes the following findings of fact. In October 2000, Gordon Todd Skinner, along with his attorney, Tom Haney, went to the Department of Justice in Washington, D.C. to inform Justice officials about the location of a large LSD laboratory. Skinner told Justice officials that he had been a part of the organization that had manufactured LSD and was now in possession of the laboratory

equipment. Skinner told them that William Leonard Pickard and Clyde Apperson were also partners in the LSD manufacturing operation. Skinner said that the equipment was at a decommissioned missile base near Wamego, Kansas that he owned.

On October 23, 2000, at the request of law enforcement officials, Skinner met Pickard in a hotel room in Marin County, California. The meeting was videotaped. During the meeting, Pickard and Skinner discussed the LSD laboratory and its movement from its present location. Pickard advised Skinner that he wanted Apperson to take possession of the laboratory.

On October 27, 2000, DEA agents and others conducted a walk-through of the missile base with Skinner. They observed the contents of a non-operational LSD laboratory packed in approximately 45 large, green shipping containers. The containers were located in a building identified as the "Lester Building" on the base. On October 31, 2000, agents executed a search warrant at the base. Agents took various samples of materials found in the containers and seized 6½ kilograms of a substance they believed was ergotamine tartrate, a precursor chemical for the manufacture of LSD. The substance, however, tested positive for ergocristine, a material that can be used interchangeably with ergotamine tartrate in the manufacture of LSD.

Subsequent phone conversations occurred between Skinner and Pickard. All of these conversations were recorded. Eventually, Pickard told Skinner that he was coming to see the laboratory and, in particular, to make sure that the ergocristine was secure. Skinner reported that the ergocristine was in Tulsa, where he had previously lived, and where his mother owned a spring manufacturing company. On November 2, 2000, Pickard and Apperson arrived in Tulsa. Skinner drove from Wamego on November 3rd and met them. He finally revealed to Pickard and Apperson that the ergocristine was in Wamego with the rest of the laboratory equipment.

Pickard and Apperson then traveled to Wamego, Kansas on November 4, 2000. They made the trip in a Buick automobile they had rented in Tulsa. They met Skinner near the missile base. These conversations were also recorded. Several arguments occurred among the trio. Pickard and Apperson expressed their concern about storage of the laboratory equipment at Wamego. They also indicated that they were concerned for their safety if the entire laboratory, including the ergocristine, was not returned to them.

Pickard and Apperson began making plans for the transfer of the laboratory equipment from Wamego. They rented a truck in Topeka, Kansas. The return destination for the truck was Albuquerque, New Mexico. Pickard and Apperson subsequently drove the truck to the base and left it there. They began loading the truck in the Lester Building on the evening of November 4, 2000. The loading lasted until the morning hours of November 5, 2000. They were, however, not prepared to leave until they obtained the ergocristine. They had additional conversations with Skinner concerning the ergocristine. Skinner agreed to return the ergocristine. On November 6, 2000, the ergocristine was returned to the base by the DEA. Skinner told Pickard where the ergocristine was located. Pickard went to that location on the base and retrieved it. Pickard and Apperson then left the base. Pickard was driving the Buick that he and Apperson had used to travel from Tulsa. Apperson was driving the rented truck. As they left the area, Kansas Highway Patrol officers activated their emergency lights and sirens to stop them. The vehicles driven by Pickard and Apperson, how-

ever, increased their speed. The troopers pursued the vehicles and eventually forced them to stop by pulling in front of the truck. Apperson was removed from the truck and taken into custody. Pickard fled from the scene on foot after letting the Buick roll to a stop and end up in a ditch. A subsequent search failed to detect him.

Pickard was arrested the following day after being found by a farmer. He was found in a truck at the farmer's property about four miles west of Wamego. The farmer saw Pickard in the truck, and Pickard got out. Pickard advised the farmer that he had gotten stuck early in the morning and needed a ride to Manhattan, Kansas. The farmer had heard about the manhunt and suspected that Pickard might be the subject of the search. He called local law enforcement. After their arrival, Pickard again attempted to flee. He ran through a field, but was eventually caught and arrested. The ergocristine was found in the Buick that Pickard had been driving.

Subsequently, law enforcement officers obtained search warrants. These warrants were executed at the missile base from November 17, 2000 to November 22, 2000. The execution of the warrants took several days because of the volume of materials and the danger posed by the chemical substances. Law enforcement officers found an abundant amount of items and equipment associated with an LSD laboratory. They also found several chemical substances including LSD, lysergic acid, and iso-lysergic acid. Among the items found in the Buick was a recipe for the manufacture of LSD. The paper on which the recipe was written also appeared to contain past production quantities.

During the execution of the search warrants, law enforcement agents found a large patch of dead grass outside the Lester Building. Soil samples of the area were taken, and they tested positive for LSD, iso-LSD, and lysergic acid. During trial, Pickard admitted that, while Apperson loaded the equipment into the truck, he dumped hazardous solutions onto the ground of the missile base.

An analysis of the substances seized from the laboratory revealed 41.3 kilograms of LSD, 23.6 kilograms of iso-LSD, 97.5 kilograms of lysergic acid, and 6.5 kilograms of ergocristine. In the months after the seizure, agents received an additional 13 kilograms of ergocristine, which belonged to the defendants and had been taken by Skinner after the laboratory was moved from the missile base near Salina, Kansas to Wamego. The total amount of ergocristine was 19.5 kilograms.

Skinner had first met Pickard in October 1996 at an Ethnobotany Conference in San Francisco, California. Skinner eventually joined with Pickard and Apperson in the production of LSD. Skinner made this decision because Pickard represented that he had extensive experience with LSD manufacturing, including a prior conviction for the manufacture of LSD.

Pickard and Apperson established an LSD laboratory in an Aspen, Colorado residence in late 1996. Apperson's primary tasks in the conspiracy were to set up and dismantle the laboratory equipment. Pickard was the chemist. Pickard had previously studied chemistry at Purdue University under Dr. David Nichols, a biochemist with a DEA Schedule I license to manufacture LSD. While at Purdue, Pickard obtained patents for the manufacture of LSD from three countries: Hungary, Czechoslovakia and Germany. He had these patents translated. The Czech patent involved the use of ergocristine as the precursor in the manufacturing process.

Pickard obtained many of the chemicals and most of the glassware for the laboratory from Alfred Savinelli, the owner of a business in Taos, New Mexico called Na-

tive Scents. Native Scents produced and sold scented candles as well as other items. Pickard paid Savinelli over $300,000 from 1995 to 1999 for his help in obtaining the chemicals and glassware.

In September 1997, Pickard secured a residence in Santa Fe, New Mexico with the assistance of David Haley, a contractor in the Taos area. Apperson assembled the laboratory at that location. Pickard manufactured LSD there until September 1999. The rent for that house during that period was approximately $34,500. Pickard paid Haley over $260,000 for acquiring the rental, placing it in Haley's name, and making the rental payments for those two years.

In September 1999, the laboratory was removed from the Santa Fe residence and loaded into a trailer. The laboratory was stored in Santa Fe for several months.

In December 1999, Pickard and Apperson moved the laboratory to a decommissioned missile base near Ellsworth, Kansas. Pickard, Apperson, Skinner and Trais Kliphuis, Pickard's girlfriend, had flown from Santa Fe to Manhattan, Kansas around the end of November 1999 to view the missile bases and determine the viability of conducting their operation within one of them. Pickard manufactured LSD at the Ellsworth missile base for several weeks.

In May 2000, Pickard met his precursor supplier at the Ritz Carlton Hotel in Chicago, Illinois. The purpose of the meeting was to obtain a large delivery of a precursor. During the meeting, arrangements were made to provide a large quantity of a precursor to Pickard. Apperson obtained the substance in Chicago in June 2000. He delivered it to the Ellsworth missile silo.

In mid-July 2000, Skinner learned that the owner of the Ellsworth missile silo wanted access to it. Skinner believed that it was necessary to immediately move the laboratory out of the silo. Pickard and Apperson were unavailable at the time to handle the job. Pickard was in London, England, and Apperson was suffering from some health problems. Skinner had several associates assist him with the move of the laboratory. The laboratory was moved to Skinner's base near Wamego.

In September 2000, Pickard and Apperson met with Rostom Dagazian in Santa Fe to view Dagazian's rental property. Pickard, using the alias name James Maxwell, provided Dagazian with a $5000 cash deposit as security for the house. This evidence, as well as the other evidence concerning the destination of the rental truck, appeared to show that the LSD laboratory was being moved to this location for future operation.

Skinner had various duties within the LSD operation, but his primary duties appeared to be security and money laundering. He did much of his money laundering through gambling and currency exchange at casinos in Las Vegas. Skinner eventually decided to contact law enforcement officials when Pickard and Apperson talked about the killing of an informant in Oregon. He attempted to contact local officials but had no success. He eventually retained Tom Haney, a former assistant United States Attorney, who contacted the Department of Justice in Washington, D.C.

▇▇▇ To prove a drug distribution conspiracy in violation of 21 U.S.C. § 846, the evidence must establish (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators. *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir.2003). To establish possession of LSD with intent to distribute in violation of 21 U.S.C. § 841(a)(1), the government must prove the defendant (1) possessed a controlled substance, (2) knew he possessed a

controlled substance, and (3) intended to distribute the controlled substance. *United States v. Castorena–Jaime*, 285 F.3d 916, 933 (10th Cir.2002).

Based upon the court's review of the record, and drawing all inferences in favor of the government, we conclude sufficient evidence existed for the jury to find the defendants conspired to possess LSD with the intent to distribute it and to possess LSD with the intent to distribute. In fact, the evidence was overwhelming on both charges. Pickard has failed to articulate any specific problem in the jury's verdict, other than the time it took to reach it. The court finds that evidence was sufficient on all of the aforementioned elements of each of the crimes.

Pickard next suggests that the jury did not adequately consider the evidence in this case because it reached a verdict after only five hours of deliberation. He states: "This small amount of time ... is wholly insufficient to examine and decipher the vast amount of material presented to them given the length and complexity of the trial."

"We know of no rule which requires a jury to deliberate for any particular period of time." *Wall v. United States*, 384 F.2d 758, 762 (10th Cir.1967). It is the evidence and not the time required by a jury to reach a verdict that is controlling. *Ahern v. Scholz*, 85 F.3d 774, 785 (1st Cir.1996). We have already determined that the evidence overwhelmingly supported the verdict. The defendant's argument that the jury reached a verdict too quickly to have rendered a fair and impartial verdict is "a two-edged sword. The jury may have thought there was not even a shadow of doubt as to guilt." *United States v. Anderson*, 561 F.2d 1301, 1303 (9th Cir.), cert. denied, 434 U.S. 943, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977). The comments of the court in *Wall* are equally applicable here: "From our study of the record we can well

understand why the jury took no longer in coming to a decision." 384 F.2d at 762. In sum, we find no basis to grant the defendant's motion for judgment of acquittal.

## MOTIONS FOR NEW TRIAL

The court shall now turn to the motions for new trial filed by the defendants. The court has addressed many of the issues raised by the defendants in prior written orders. We will acknowledge those issues, but we do not intend to add further comment because enough has been said. Rather, we will generally focus on the issues that were raised during trial where the court made oral rulings.

The court notes initially that the defendants have offered no legal or factual support for many of the issues noted in their motions. It is difficult to address some of the arguments because of the vague nature of the proposed error. Nevertheless, the court will make every effort to address and consider all of the alleged errors.

Some initial comments are necessary. The court, based upon representations made by the parties, believed this case would last approximately six to eight weeks. It became clear a few weeks into the trial that the estimates were inaccurate. All counsel were to blame in part for the delay, but the actions and conduct of counsel for defendant Pickard were the primary contributors. His examinations of witnesses were extremely inefficient. They were often repetitive, rambling and, at times, incoherent. From the outset, he suggested that the court was treating him unfairly and differently than other counsel. The court never believed that to be the case. Rather, the court made every effort to accommodate him during the course of this litigation. In fact, the court took unprecedented steps to assist all counsel in the presentation of this case. These efforts, however, failed to produce good will.

Counsel for defendant Pickard continued to show disrespect for the court even as efforts were made to assist him. The ill-feelings of counsel led to several heated bench conferences where the court expressed its frustration with the conduct of counsel. Many of the issues raised by the defendants were the product of the problems caused by the sluggish pace of this trial.

*SUPPRESSION RULINGS* (Pickard's issues 4, 5, 6, 8 and 94) (Apperson's issues 2 and 6)

The defendants contend that the court erred in its rulings on the motions for suppression of evidence. Pickard also contends that the court erred in ruling on the issues he raised concerning Title III of the Omnibus Crime Control and Safe Street Act of 1968. The court has previously written exhaustively about the aforementioned issues in this case. We shall not revisit them. We continue to believe that our prior rulings were correct. Accordingly, the court does not find that the defendants are entitled to a new trial on any of the suppression or Title III issues.

*DISMISS BASED UPON INSUFFICIENT EVIDENCE* (Pickard's issue 39) (Apperson's issue 35)

The defendants contend that the court erred in not dismissing each count of the indictment at the conclusion of the government's case based upon insufficient evidence. The court has addressed this issue in ruling on Pickard's motion for judgment of acquittal. The court finds that no error occurred in denying the defendants' motion for dismissal.

*TREATMENT OF COUNSEL* (Pickard's issues 11, 12, 27, 49, 54, 81, 85, 91) (Apperson's issues 7, 23, 46 and 52)

█ The defendants have argued that the court made multiple errors in the treatment of counsel during the trial. Most of the alleged mistreatment concerns counsel for Pickard. Pickard contends that the court treated his counsel differently and/or unfairly in its rulings and comments. As with most of his claimed errors, Pickard's arguments lack specificity.

█ The court has broad discretion in supervising the activities in the courtroom. The court is responsible for maintaining the pace and objectivity of the trial. *United States v. Tolliver*, 61 F.3d 1189, 1207 (5th Cir.1995), vacated and remanded on other grounds, 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996). The court may comment on evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting limits on counsel. *Id.* A trial judge has a duty "to conduct a trial in an orderly fashion, to insure that the issues are not obscured and to act at all times with a view toward eliciting the truth." *United States v. Tilton*, 714 F.2d 642, 643 (6th Cir.1983). "Improper" comments by the court do not entitle the defendant to a new trial unless the comments are error that is substantial and prejudicial to the defendant's case. *Tolliver*, 61 F.3d at 1207.

The court does not believe that it engaged in any unfair or improper treatment. The court attempted to resolve every issue as fairly, as quickly and as correctly as possible. The court will readily admit that it grew impatient and frustrated as the trial of this case continued. The court was constantly looking for ways to save time. In doing so, the court made a point to confront Pickard's counsel and attempt to move his examinations along. The court believed that his examinations were largely responsible for the ponderous nature of the trial. They were at times overly long, repetitious and irrelevant. The court's efforts, however, were always aimed at having the trial progress at an appropriate rate, and not

to demonstrate favoritism of one side over the other. See *United States v. Owens,* 159 F.3d 221, 227 (6th Cir.1998), cert. denied, 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999).

 Even if the court did inadvertently or unintentionally treat Pickard's counsel differently, the defendant is not entitled to a new trial unless the difference in treatment undermined confidence in the verdict. *United States v. Rutgard,* 108 F.3d 1041, 1050 (9th Cir.1997). The court does not believe any fatal error occurred here for the aforementioned reasons. First, the evidence against the defendants was overwhelming. Second, most of the comments made by the court were made during bench conferences and not in the presence of the jury. Finally, we believe that the instructions given by the court ameliorated any possible error that occurred. The court instructed the jury during the trial and in the final instructions that any comments by the court should have no impact on any of the issues of the trial. In sum, we find no basis for relief.

*DENIED ADEQUATE TIME TO PREPARE OR PRESENT EVIDENCE* (Pickard's issues 53, 60, 67, 68, 69, 70 and 80) (Apperson's issue 51)

 The defendants contend that the court denied them adequate time to prepare or present evidence during various stages of the trial. Pickard raises most of the complaints. He contends that the court erred in (1) denying a continuance to allow additional defense witnesses to testify at trial; (2) allowing only 30 minutes for the presentation of Skinner's testimony during the hearing on his motion to dismiss and/or mistrial based upon outrageous governmental conduct; (3) not allowing a one to two-week continuance after the government rested its case so that he could further review the government's evidence and seized materials; (4) not allow-

ing additional time to review the proposed instructions; (5) not allowing additional time for the preparation of closing arguments; and (6) in limiting the time for direct examination of the defendant. Apperson has specifically joined in his first contention.

 Unreasonable time constraints imposed by a trial court can result in inadequate preparation. *United States v. La Monte,* 684 F.2d 672, 674 (10th Cir. 1982). "Whether court-induced lack of preparation deprives a defendant of Sixth Amendment rights turns on the circumstances underlying the particular case." *United States v. King,* 664 F.2d 1171, 1173 (10th Cir.1981). In considering any request for additional time or a continuance, the court must carefully examine and balance various considerations. *Rutgard,* 108 F.3d at 1049. A constitutional violation occurs only if the denial was an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. *United States v. Hall,* 200 F.3d 962, 964 (6th Cir.2000). The defendant must show that the denial resulted in actual prejudice in his defense. *Id.*

The court made every effort to accommodate the requests made by defense counsel. However, the court was cognizant of other considerations in evaluating the defendants' requests. The court was forced to consider the positions of the government, the jury, the witnesses, and court personnel. The court believes that in each instance defense counsel was given sufficient time to prepare or to adequately conduct their case. This case had been pending for over two years before it went to trial. During this period, defense counsel had adequate time to prepare. Once the trial began, the court made constant efforts to move it along. These efforts were designed solely to see that the case

proceeded as expeditiously as possible with an eye on justice being done for all parties.

The court is not persuaded that the defendants were prejudiced by any of the decisions made by the court concerning time limits. The defendants have failed to point to any particular area where the court's rulings would have made any difference.

*DENYING REQUESTS FOR DISCOVERY/PRODUCTION OF DOCUMENTS* (Pickard's issues 7 and 31) (Apperson's issues 5 and 27)

 The defendants assert that the court erred by not allowing some of their requests for discovery and for the production of documents. Such requests are subject to the court's discretion. *Castro v. Ward,* 138 F.3d 810, 833 (10th Cir.), cert. denied, 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998). In most cases, the court made every effort to grant the defendants' requests. The court, however, found at various times that the defendants' requests were not timely, required by the law, or necessary to the defense. In these instances, the court denied the defendants' requests. The court finds no error in the rulings made by the court.

*PROHIBITING PRESENTATION OF CERTAIN EVIDENCE, PARTICULARLY CROSS–EXAMINATION* (Pickard's issues 52, 57, 78 and 92) (Apperson's issue 50)

The defendants contend that the court erred in prohibiting the presentation of certain evidence. In particular, they note that the court prevented them from cross-examining several witnesses on various issues.

 The district courts have wide discretion to restrict cross-examination to avoid repetition. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d

347 (1974). While the Confrontation Clause guarantees defendants an "opportunity for effective cross-examination," it does not guarantee a "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

The court attempted to give defense counsel sufficient leeway on a number of issues, but the court made various rulings to avoid the presentation of inadmissible, irrelevant and repetitious matters. The court believes that those rulings were proper. Accordingly, we are not persuaded that a new trial is necessary for this reason.

*ADMISSION/DENIAL OF CERTAIN EXHIBITS/EVIDENCE* (Pickard's issues 14, 16, 20, 24, 33, 34, 35, 36, 37, 38, 40, 44, 48, 50, 65, 87, 88 and 89) (Apperson's issues 8, 10, 14, 18, 20, 29, 30, 31, 32, 33, 34, 36, 45, 48 and 57)

The defendants contend that the court erred at various times during the trial when it either admitted or denied certain exhibits and evidence. The defendants have pointed to numerous examples where the court should have made a contrary ruling.

 The admission of evidence is "a discretionary judgment call by the trial judge as the rules of evidence provide." *United States v. Willie,* 941 F.2d 1384, 1398 (10th Cir.1991), cert. denied, 502 U.S. 1106, 112 S.Ct. 1200, 117 L.Ed.2d 440 (1992). The starting point for the introduction of any evidence is relevance. However, a finding that evidence is relevant "does not validate the form in which that evidence is admitted." *Johnson v. Colt Ind. Operating Corp.,* 797 F.2d 1530, 1534 (10th Cir.1986). The court must then consider whether the evidence is admissible under the other rules of evidence. Lastly, the court must determine, even if

the evidence is relevant and admissible, whether it should be excluded because its probative value is outweighed by its prejudicial effect. *Willie,* 941 F.2d at 1398.

The court attempted to apply the aforementioned rules to all of the evidence in this case, both offered in favor of and against the defendants. The court will only comment on a few of the matters raised by the defendants because the court offered the basis for its rulings during trial. We address a few matters in order to clear up any misunderstanding that may be presented by the manner in which the defendants have framed the issue.

The defendants have suggested that the court erred by denying their objections to Government Exh. #568, the Parole Commission's Notice of Discharge of defendant Pickard. Some explanation is necessary because the defendants appear to suggest that this exhibit was admitted into evidence when it was not.

During the testimony of Agent Sorrell, the government sought to introduce a large group of exhibits, most of which had been taken from a storage locker rented by Pickard in Somerville, Massachusetts. The defendants indicated that they had no objection to any of these exhibits, including Exh. #568. Government's counsel then began displaying these exhibits to Agent Sorrell and to the jury through the court's video capabilities. Counsel for the government placed Exh. #568 on the video equipment so that all in the courtroom could see it. When defense counsel realized what it was, they quickly objected. Government's counsel immediately withdrew it from the video equipment and it was no longer shown. The document was in view of the jury for approximately thirty seconds. Thereafter, a bench conference was held and the court ultimately sustained the defendants' counsels' objections to the exhibit.

The court found all counsel at fault for this problem. Defense counsel had an opportunity to view all the evidence in the government's possession prior to trial and raise any issues they believed were appropriate. In addition, they had opportunity to object to this document before it was admitted. The defendants did neither. They allowed the document to be admitted and then complained when it was shown to the jury. The conduct of defense counsel was inexcusable. The explanation they offered in support of their error was weak. They suggested they had agreed to admission of the large group of documents offered by the government in an effort to speed up the trial. This is, of course, a valid motive, but it does not, and should not, prevent counsel from adequately representing their client.

On the other hand, the court was perplexed by the efforts of the government to introduce this document. It is a prejudicial document that appears to have no relevance to this case. Given the potential prejudicial nature of this document, the government might have wanted to specifically call it to the attention of defense counsel when seeking to introduce it along with some 40 other documents. We do note that government counsel, once the document was admitted, had every right to display it to the jury.

Despite the transgressions of all counsel, the court does not find that any prejudice occurred. The document was only available for viewing for a very brief period of time. Moreover, other relevant evidence during the trial pointed to Pickard's criminal history. Finally, the evidence of guilt was overwhelming, and we are convinced that this matter had no impact on the jury's decision.

The defendants have also suggested that the court erred in admitting Exh. #11 and

Exh. # 11 A. They contend that these exhibits were not properly authenticated.

■ Exhibit # 11 was the videotape of the meeting between Skinner and Pickard in California on October 23, 2000, and Exhibit # 11A was the transcript of that videotape. The court believes that Skinner's testimony provided proper authentication and foundation for the introduction of these exhibits. He testified that the recording accurately showed what occurred during the meeting. He further testified that the transcript was true and accurate. The court instructed the jury that the transcript was not evidence and that if it found any inconsistencies between the tape and the transcript, then the tape controlled. The court finds no merit to the arguments raised by the defendants concerning these exhibits.

■ The defendants object to the admission of various letters written by Pickard after his arrest on the charges here. They suggest that these letters lacked relevance. They further indicate that the introduction of the letters written to Bill Wynn and Karl Nichols was "incriminatory as to … Apperson and … prejudicial to Apperson and in violation of the Bruton doctrine."

The letters noted by Pickard contained admissions against interest. As a result, they were admissible under Fed.R.Evid. 801(d)(2)(A). *United States v. Gonzalez–Montoya,* 161 F.3d 643, 648 (10th Cir.1998) cert. denied, 526 U.S. 1033, 119 S.Ct. 1284, 143 L.Ed.2d 377 (1999); *United States v. Mayes,* 917 F.2d 457, 463 at n. 8 (10th Cir.1990) cert. denied, 498 U.S. 1125, 111 S.Ct. 1087, 112 L.Ed.2d 1192 (1991). The arguments that they lacked relevance or were inadmissible are without merit.

■ The defendants have also suggested that the admission of these letters violated the Bruton doctrine. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a co-defendant admitted to a postal inspector that he and the defendant committed a robbery. The postal inspector testified that the defendants committed a robbery. The co-defendant did not testify. Although limiting instructions were given to disregard the confession as against the defendant, the defendant argued that his Sixth Amendment rights under the Confrontation Clause were violated. The Supreme Court held that because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining the defendant's guilt, admission of the co-defendant's confession in a joint trial violated the defendant's right of cross-examination secured by the Confrontation Clause. 391 U.S. at 136–37, 88 S.Ct. 1620.

Here, neither *Bruton* nor the Confrontation Clause was violated because Pickard testified and was subject to cross-examination. *United States v. Wolf,* 839 F.2d 1387, 1396 n. 6 (10th Cir.) cert. denied, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). Accordingly, this argument also lacks merit.

Pickard next argues that the court erred in denying the admission of his "INFRARED" document. He suggests that this document was the "heart and soul of his theory of defense."

The "INFRARED" document referred to by Pickard was a bound volume containing various materials that he had accumulated over the years. The document had been assimilated by someone else and had been sent to federal agencies in approximately January 2003, well after his arrest in this case. The court refused to admit the document for several reasons. First, the court found it irrelevant to these proceedings. The court did allow Pickard to present testimony and documents concerning his defense based upon Infrared. The

compilation of documents, however, had no relevance to the case. Second, the volume contained numerous hearsay documents. The court continues to believe it correctly denied admission of this exhibit.

Finally, Pickard argues the court erred in not allowing documents that showed his relationship with George Marquardt. Pickard argues that this evidence would have "aided and assisted him."

The court allowed Pickard to testify at length concerning his relationship with Marquardt. The court also allowed some documents showing this relationship. The court found, however, that other documents were either inadmissible as hearsay or barred by Rule 403. The court stands by those rulings. The court finds no error. *ALLOWING GOVERNMENT TO PLAY GOVERNMENT'S EXHIBIT # 11 THREE TIMES* (Pickard's issues 21 and 22) (Apperson's issues 15 and 16)

 The defendants contend that the court erred in allowing the government to present the same video recording, Exhibit # 11, to the jury three times. The court will admit that this issue did test the court's patience and fairness.

The government first sought to play a videotape of a meeting between Pickard and Skinner that occurred on October 23, 2000, in Marin County, California, during the testimony of Agent Ralph Sorrell. This appeared to the court to be an inappropriate time to play the tape since Agent Sorrell did not take part in the videotaping and was not actively involved in this aspect of the case. The government did not seek to introduce it at that point. During the showing of the tape, it was obvious that it was of little value to anyone in the courtroom because the picture and sound were muddled. On the following day of trial, the government explained that the copy of the tape had not played properly on the court's video equipment. The government sought to play it again using the original

videotape and a transcript. The court, over the objection of the defendants, allowed the government to play the tape again. The video on this tape was better, but the audio remained very difficult to understand.

The government then sought to play the tape again during Skinner's testimony. This time the government wanted to play their tape on their own equipment. The court wrestled with this decision. On the one hand, the court did not want to overemphasize this piece of evidence. On the other hand, the court wanted the tape to be heard and understood by the jury. The court ultimately determined that playing the tape was the only fair procedure.

The court continues to believe that the approach adopted during the trial was necessary to allow the jury to hear this tape. The court believes that this particular matter was mishandled by the government. Nevertheless, the court found it important that the jury hear and understand the contents of this tape. The court does not believe that the defendants were prejudiced by the court's handling of this issue. *EVIDENCE OUTSIDE THE DATES OF THE CONSPIRACY* (Pickard's issues 28, 29 and 30) (Apperson's issues 24, 25 and 26)

The defendants contend that the court allowed evidence outside the dates of the conspiracy alleged in Count 1. The defendants assert that the presentation of this evidence was prejudicial to them.

 There is no requirement that all of the government's evidence fall within the time period charged in the indictment, provided it is relevant to the charges. See *United States v. Bagaric,* 706 F.2d 42, 65 (2nd Cir.1983), abrogated on other grounds, *National Organization for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). Evidence of prior criminal acts may be relevant in con-

spiracy cases to show the background and development of the conspiracy. *United States v. McKoy*, 771 F.2d 1207, 1214 (9th Cir.1985); *United States v. Evans*, 697 F.2d 240, 248 (8th Cir.), cert. denied, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983). Such evidence may explain the nature of the relationship between the co-conspirators and put the alleged transactions in context for the jury. *McKoy*, 771 F.2d at 1214; see also *United States v. Harrison*, 942 F.2d 751, 760 (10th Cir. 1991) ("Evidence of Harrison's long history of marijuana and cocaine trafficking with William Wood was ... particularly probative of his state of mind during the drug transactions perpetuated over the course of this conspiracy.").

The court did allow various evidence of prior activities by the defendants. The purpose of this testimony was to provide the jury with some background about the development of the conspiracy. The court continues to believe that this evidence was admissible. Accordingly, we find no error in these rulings.

*JURY ISSUES* (Pickard's issues 76, 77 and 83)

Pickard contends that the court erred in several respects concerning its handling of the jury. First, he contends that the court erred in not having the jury discontinue deliberations after they requested an index of exhibits. Second, he contends that the court erred in allowing the jurors to take newspapers to the jury room during the trial.

■ The facts concerning the first issue raised by Pickard are as follows. On March 31, 2003, just after the jury began deliberating, they sent a note to the court requesting an index of the exhibits. The court met with counsel and determined that a satisfactory index of the parties' exhibits did not exist. The parties agreed that the indices provided by them to the court could not be submitted to the jury because they contained improper, partisan comments in reference to many of the exhibits. The court decided to inform the jury that an index could be provided, but that it would take some time. The defendants did not request or suggest that the deliberations be discontinued while the index was prepared. The jury continued to deliberate while the court prepared a sanitized version of the indices. The court had almost concluded this task when the jury informed the court that it had reached a verdict.

■ The court has broad discretion in handling matters of jury deliberation. *United States v. Conley*, 186 F.3d 7, 23 (1st Cir.1999), cert. denied, 529 U.S. 1017, 120 S.Ct. 1417, 146 L.Ed.2d 310 (2000); *United States v. Arboleda*, 20 F.3d 58, 61 (2nd Cir.1994). Although great discretion is left to the court when the conduct of a trial is at issue, its decisions must be designed to protect the rights of the parties. *United States v. Rana*, 944 F.2d 123, 126 (3rd Cir.1991), cert. denied, 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 143 (1992).

The court certainly did not believe that it was necessary or appropriate to discontinue deliberations based upon the jury's request. The court is unaware of any prejudice to the defendants that occurred as a result of these circumstances. Accordingly, the court finds no basis for relief.

■ In turning to the second issue raised by the defendants, the court does acknowledge that no efforts were made to prevent jurors from taking newspapers to the jury room during trial. The defendants never raised any concern about this matter during the trial. The court does not believe that the prohibition noted by the defendants was necessary or appropriate. In any event, the defendants have produced no evidence that any newspapers were ever brought into the jury room. The court is not aware if the jurors

brought newspapers to the jury room. The court did admonish jurors on several occasions not to read anything in the newspaper about this case. The court believes that that admonishment was adhered to by the jurors. The defendants have failed to point to any prejudice that may have occurred as a result of the jurors' access to newspapers during the trial. Accordingly, the court finds no support for relief on the basis of this issue either.

*ALLOWING THE GOVERNMENT TO PROVIDE LATE DISCOVERY WITH-OUT PENALTY* (Pickard's issues 47, 61, 64 and 86) (Apperson's issue 44)

The defendants contend that the court erred in not sanctioning the government for repeatedly providing late discovery materials to them. Specifically, the defendants argue that the government provided the following materials untimely: (1) photographs of the "broken door" of Pickard's apartment; and (2) fingerprint testing.

The court previously considered this issue in its order of April 4, 2003. In that order, the court found nothing to support the defendants' contentions that the government had provided any materials to them in an untimely fashion. The court stated the following:

> It appears to the court that the government has made all the evidence required by Fed.R.Crim.P. 16, Brady and Giglio available to the defendants. The court is unaware of any material that has been intentionally withheld from the defendants.

Moreover, the court does not find that the defendants have specifically alleged or established any prejudice arising from the alleged late discovery. The defendants have vaguely suggested that their cross-examination was hindered, but have failed to point to any specific examples.

In sum, the court finds no merit to this claim.

*DENYING DISMISSAL OF SECOND SUPERSEDING INDICTMENT/AL-LOWING GOVERNMENT TO AMEND INDICTMENT BY INTERLINEATION* (Pickard's issues 9 and 56) (Apperson's issues 3 and 54)

The defendants contend that the court erred in denying their motion to dismiss the second superseding indictment. The defendants also argue that the court erred in allowing the government to amend Count 1, the conspiracy charge, by interlineation to allege a different time period.

The court issued a written order on the defendants' motion to dismiss on February 4, 2002. The court found no merit to any arguments raised by the defendants concerning the second superseding indictment. The court found specifically that changing the operative dates for the conspiracy in the second superseding indictment was permissible. The court continues to believe that these issues were correctly decided. Accordingly, these claims provide no basis for relief.

*DISMISSAL BASED ON SPEEDY TRI-AL* (Pickard's issue 10) (Apperson's issue 4)

The defendants contend that the court erred in denying their motion to dismiss based upon a violation of the Speedy Trial Act. The court addressed this issue in a written opinion issued on January 13, 2003. In that order, we denied the defendant's motion to dismiss. The court found that no Speedy Trial Act violation had occurred. The court continues to believe that we correctly decided it. Accordingly, this claim provides no basis for relief.

*DENYING EVIDENCE AND ARGU-MENT ON CERTAIN MATTERS* (Pickard's issues 18, 19, 43, 44 and 58) (Apperson's issues 12, 13, 40 and 41)

The defendants contend that the court erred in denying evidence on several mat-

ters. Specifically, the defendants assert that the court erred in not allowing testimony concerning: (1) Skinner's participation as an informant in *State v. Worthy*, 141 N.J. 368, 661 A.2d 1244 (1995) in New Jersey; (2) Skinner's involvement in the death of Paul Hulebak at the Wamego missile base; and (3) Shawn Rolph's knowledge of drug use at the Wamego missile base.

 The court has considerable discretion in determining what evidence to admit. *United States v. Oliver*, 278 F.3d 1035, 1042 (10th Cir.2001). Evidence must be relevant to be admissible. Fed.R.Evid. 402. A trial judge may refuse to admit relevant evidence if it is more prejudicial than probative. Fed.R.Evid. 403. Unfair prejudice in the Rule 403 context " 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir.2001) (quoting Fed.R.Evid. 403 advisory committee's note). The district court has considerable discretion in performing the Rule 403 balancing test. However, exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly. *Id.*

The court carefully addressed the Worthy case and Hulebak death in a written order filed on June 20, 2002. In that order, the court granted the government's motion in limine concerning these subjects. The court found that the probative evidence of these matters was substantially outweighed by their prejudicial effect. The court continues to believe that it was proper to exclude these matters at trial.

During trial, the court heard argument on some proposed testimony from Shawn Rolph. Rolph was a former Wamego police officer who had worked for Skinner as security at the missile base for three months in 1996. Pickard indicated to the court that Rolph would testify about drug activity at the missile base during his employment there. He also suggested that Rolph would testify that a woman who had been at the base told him that she had used LSD provided by Skinner. He also stated that Rolph would testify that he provided this information to a DEA agent in Topeka. The government objected to the aforementioned testimony because it was cumulative and based upon hearsay. The government further argued that it was barred by Fed.R.Evid. 403 because its probative value was outweighed by its prejudicial effect.

The court eventually determined that the proposed evidence should not be allowed based upon Rule 403. The court found that the probative value of this evidence was small and its prejudicial impact was great. The evidence appeared to the court to be based upon hearsay and speculation. Moreover, the evidence appeared not to be timely. In sum, the court found, and continues to find, that this evidence should be barred by Rule 403.

## DENIAL OF MOTIONS TO DISMISS OR MISTRIAL BASED UPON PROSECUTORIAL MISCONDUCT AND/OR OUTRAGEOUS GOVERNMENT CONDUCT (Pickard's issues 25, 26, 42, 45 and 55) (Apperson's issues 19, 21, 39, 42 and 53)

The defendants contend that the court erred in denying their motions for dismissal or mistrial based upon prosecutorial misconduct and/or outrageous government conduct. The defendants made several oral motions during the course of the trial. They also submitted written motions.

The court denied these motions during trial and then issued a written order on April 4, 2003. In that order, the court carefully examined each of the issues raised by the defendants during trial. We

again continue to believe that we correctly ruled on all of these issues.

## DENIAL OF EVIDENCE CONCERNING POLYGRAPH EXAMINATIONS (Pickard's issues 15 and 41) (Apperson's issues 9 and 38)

The defendants contend that the court erred in denying evidence concerning polygraph examinations. The defendants contend that the court should have allowed evidence regarding the polygraph examinations of Skinner and the provisions of Haley's plea agreement which provided for a polygraph examination of him.

The court addressed the issue of Skinner's polygraph examination in its order of June 20, 2002. There, the court concluded that the probative value of this evidence was outweighed by its prejudicial effect. The court continues to believe this issue was correctly decided.

During the testimony of Haley, defense counsel sought to examine him about the provisions of his plea agreement that provided for a polygraph examination. The government objected. The court sustained the government's objection. The court also believed that the probative value of this evidence was outweighed by its prejudicial impact. Again, we believe we correctly decided this issue.

## MAKING IMPROPER COMMENTS OR NOT MAKING PROPER COMMENTS (Pickard's issues 11, 17, 46, 49, 54 and 82) (Apperson's issues 7, 11, 37, 43, 46 and 52)

The defendants contend that the court erred during the trial in making certain unfair and prejudicial comments. The defendants also assert that the court erred by not making certain necessary comments during the trial. Essentially, the defendants argue that the court erred: (1) by ruling on evidentiary objections with prejudicial comments; (2) by stating that a conspiracy existed between the defendants; (3) by commenting on the relevance or lack of relevance of evidence offered by the defendants; (4) by making derogatory comments about both counsel; (5) by chastising Pickard's counsel; and (6) by failing to regularly admonish the jury to not discuss the case or consider anything produced by the media.

The trial court has wide discretion in stating facts and commenting on the evidence. *Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 140 (10th Cir.1994). It is within the trial court's power to direct the trial in a manner reasonably thought to bring about a just result and in pursuit of that goal, nonprejudicial comments may be made from time to time. *Id.*

The court has carefully reviewed its notes and portions of the transcript. The court is not persuaded by the allegations made by the defendants. The court did at times comment upon objections and evidence. The court believed that these statements were appropriate and necessary each time they were made. To the extent that the court made any improper comments, the court does not find that the defendants have established any prejudice arising from them. Accordingly, the court shall not grant any relief based upon these contentions.

## ALLOWING OR NOT ALLOWING CERTAIN JURY INSTRUCTIONS (Pickard's issues 72, 73, 74 and 75) (Apperson's issue 47)

The defendants contend that the court erred in not giving certain instructions they requested. They further argue the court erred in allowing certain instructions to which they had made objections. The only specific argument that Pickard makes is that the court erred in not giving his proposed instructions on the public authority defense and the entrapment by estoppel defense. Apperson has argued that the court erred in not giving his proposed instructions 26 and 37.

■ The court shall turn initially to Pickard's argument. "A criminal defendant is entitled to an instruction on his theory of defense provided that theory is supported by some evidence and the law." *United States v. Haney*, 318 F.3d 1161, 1163 (10th Cir.2003).

The court spent some time detailing the history of Pickard's proposed defenses in this case in its order of November 26, 2002. The defenses of public authority and entrapment by estoppel were never specifically mentioned until a hearing on November 8, 2002. At that time, Pickard suggested that his defense would be based either on (1) lack of mens rea because he was performing otherwise criminal acts in cooperation with the government; (2) the public authority defense because he reasonably believed that he was acting on the authority of a public official; or (3) entrapment by estoppel because he was relying on the representation of a government official that his conduct was legal. On November 13, 2002 the defendant filed a notice of public authority defense pursuant to Fed.R.Crim.P. 12.3. The government responded with a motion in limine concerning this defense. The court denied that motion. The government again raised the issue during a hearing on December 17, 2002. The court again denied the government's request to exclude these defenses and the accompanying evidence from the trial. The court, however, expressed its reluctance in allowing the defendant to proceed with these defenses, at least based upon what had been produced by the defendant to that point:

> The court would be the first to agree that the connection between Operation Infrared and the charges in this case, at least as we presently understand it, are tenuous. Nevertheless, the court believes that Pickard has articulated sufficient information to avoid exclusion of his defenses prior to trial. At trial, the court will again carefully examine the evidence offered by him and determine what defenses may be considered by the jury.

During the trial, Pickard made efforts to support these defenses. At the conclusion of the trial, the court determined that he had not presented sufficient evidence on either defense to allow it to go to the jury. The court continues to believe that this decision was correct.

The court has not uncovered any Tenth Circuit cases on the "public authority" defense. In fact, "[p]ublished decisions pertaining to the defense of actual public authority are sparse, possibly because reliance on the defense is rare." *United States v. Pitt*, 193 F.3d 751, 756 (3rd Cir. 1999). Accordingly, the court was forced to turn to other jurisdictions for an examination of this defense.

■ With the affirmative defense of public authority, the defendant seeks exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity. *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1368 n. 18 (11th Cir. 1994). The validity of the defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question. *Id.* Reliance on the apparent authority of a government official is not a defense because it is deemed a mistake of law. *Id.* A defendant may rely, however, on a government official's real authority to authorize his conduct. *Id.*

■ The defendant was never able to establish that he reasonably relied upon the authority of any government official to engage in the conduct that led to the charges in this case. His own testimony on this issue was inadequate. He never testified that any official specifically gave him authority to possess LSD equipment

or manufacture LSD. He called as witnesses several government officials who specifically denied that they ever gave him the power to engage in covert activities. Moreover, the defendant failed to offer any evidence that any of these officials had the authority to permit him to engage in the violation of federal drug laws. His position appeared to be that past dealings with various governmental officials had given him de facto power to engage in these activities because he was attempting to gain information on either Skinner or George Marquart. The defendant, however, was unable to show that any government officials had ever authorized his illegal activity. Accordingly, the court determined that the defendant was not entitled to a public authority defense instruction. The court believes that this ruling was correctly made.

▄▄▄ The defense of entrapment by estoppel is implicated where a government official misleads a party as to the legality of certain conduct and the party proceeds to act on the misrepresentation so that criminal prosecution of the party implicates due process concerns under the Fifth and Fourteenth Amendments. *United States v. Gutierrez–Gonzalez*, 184 F.3d 1160, 1166 (10th Cir.), cert. denied, 528 U.S. 1011, 120 S.Ct. 513, 145 L.Ed.2d 397 (1999). There must be "active misleading" by the government agent, and actual reliance by the defendant. *Id.* Finally, the defendant's reliance must be reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation. *Id.* The doctrine of estoppel against the government is invoked with great reluctance. *Id.*

The court found the evidence presented by the defendant wholly lacking on this defense. The defendant was unable to show that any government agent had made any specific representations to him upon which he relied. The defendant did not

enthusiastically press this theory and, given the state of the evidence, we can see why. The court is thoroughly convinced that no error was made in refusing to instruct the jury on this defense.

▄▄▄ The court shall next turn to Apperson's argument. He contends that the court erred by denying his proposed instructions 26 and 37. In proposed instruction 26, he sought the following instruction:

Statements of accomplices or co-defendants are presumptively unreliable as to passages detailing the defendant's conduct or culpability because those passages may well be the product of the declarant's desire to shift or spread the blame, curry favor, avenge himself or herself or divert attention to another.

The court denied Apperson's proposed instruction and, instead, gave the following instruction:

The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received either financially or as a result of being immunized from prosecution. You should keep in mind that such testimony is always to be received with caution and weighed with great care.

In reviewing jury instructions, the court must determine if the instructions properly state the law and provide the jury with ample understanding of the issues and the

standards applicable. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988). The instructions must cover the issues presented by the evidence and accurately state law. *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir.), cert. denied, 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992). A new trial is warranted only when a failure to give an instruction is prejudicial in view of the entire record. *United States v. Martin*, 18 F.3d 1515, 1519 (10th Cir.), cert. denied, 513 U.S. 868, 115 S.Ct. 187, 130 L.Ed.2d 121 (1994).

The instruction requested by the defendant was adequately covered by the instruction given by the court. The proposed instruction introduced various elements, such as the use of presumptions, that the court thought might be confusing to the jury. Since the court's instruction adequately covered the point sought by the defendant, we find no basis for a new trial. See *Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1248 (10th Cir.1998) ("[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law."), cert. denied, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999); *Oertle v. United States*, 370 F.2d 719, 726 (10th Cir.1966) (district court not required to give proposed jury instruction, even though substantively correct, if point of law it refers to is fairly and adequately covered by the instructions), cert. denied, 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329 (1967).

■ Apperson next argues that the court erred by refusing to give his proposed instruction number 37. This instruction read as follows: "The testimony of a perjurer should always be considered with caution and weighed with great care." Apperson believed that this instruction was appropriate based upon the evidence that Skinner had made misrepresentations to a Washington state court.

The evidence did show that Skinner appeared in a Washington state court and told the court that he was a doctor. He further told the court that he had been treating the young woman who was before the court as a defendant. Both of these representations were indeed false. The court, however, decided that the instruction requested by Apperson was not appropriate because Skinner had never been placed under oath during the proceedings in Washington. See *United States v. Liporace*, 133 F.3d 541, 545 (7th Cir.) (defendant not entitled to perjurer instruction based upon evidence that witness lied in giving statement to police officers), cert. denied, 523 U.S. 1131, 118 S.Ct. 1823, 140 L.Ed.2d 959 (1998). The court continues to think that this ruling was correct. Moreover, the court believes that our general instructions on credibility and impeachment adequately covered this issue. See *United States v. Johnston*, 146 F.3d 785, 792 (10th Cir.1998), cert. denied, 525 U.S. 1088, 119 S.Ct. 839, 142 L.Ed.2d 694(1999).

In sum, the court finds no error in the decisions made by the court concerning the instructions. These claims provide no basis for relief.

## ALLOWING EVIDENCE OF PAST BAD ACTS (Pickard's issues 62 and 63)

■ Pickard contends that the court erred in allowing certain evidence of his past bad acts and/or convictions. He asserts that the court erred in allowing evidence of his prior LSD conviction for the manufacture of LSD in Mountain View, California. He suggests that it was improper to allow this evidence based upon his use of the public authority defense. He also contends that the court erred in allowing the government "to ask questions of prior offense conduct or bad acts out-

side the parameters of the time proposed under the public authority defense."

The court finds it necessary to provide some factual background concerning these matters. Prior to the trial, the defendant filed a motion in limine in which he sought an order precluding certain convictions and arrests. On November 26, 2002, after an exhaustive hearing on several pretrial motions, the court noted that it had initially believed that the defendant's prior drug acts would not be admissible under F.R.E. 404(b) based upon the application of the four-part test set forth in *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). However, the court further determined that the court not grant the defendant's motion because of the proposed defenses that the defendant intended to rely upon. The court ruled that a decision on the introduction of these matters would have to await trial.

At trial, the court allowed evidence of Pickard's prior LSD conviction during the testimony of Skinner. The evidence was admitted because it showed why Skinner had joined with Pickard in the conspiracy to manufacture LSD. Pickard had bragged to Skinner about his prior conviction as a way to show his expertise in the manufacture of LSD. Pickard's comments led Skinner to believe that Pickard was an experienced and successful LSD chemist.

The court, contrary to the arguments of the defendant, did not allow this evidence under Rule 404(b). Rather, the court allowed the evidence to show the basis for Skinner's participation in the conspiracy. Thus, the court believes that the evidence was admitted for a proper purpose. The defendant's argument is based upon an inaccurate factual basis and therefore lacks merit.

The defendant has failed to articulate any other bad acts or conduct of his allowed by the court. The court shall not speculate about this argument. The court does not find that the defendant has identified any evidence that was erroneously admitted.

*ALLOWING JURY TO SEE TRANSCRIPTS AND PICTURES OF PARTICIPANTS OF TAPE RECORDED CONVERSATIONS* (Pickard's issue 23) (Apperson's issue 17)

 The defendants contend that the court erred in allowing the jury to see transcripts of tape recorded conversations. The defendants further contend that the court erred in allowing the pictures of the participants to the conversations to be seen during the playing of the recordings.

The government played various tape recordings during the course of the trial. The tapes were played on the court's new technology. The transcripts of the conversations were displayed on computer monitors for the jury to follow as the tapes were played. The pictures of the individuals speaking were also displayed on those monitors as their voice appeared during the recordings. The court admitted only the tape recordings into evidence. The court did not admit the transcripts. The court instructed the jury at the time the tapes were played and again during the closing instructions that the tapes were the evidence and the transcripts were not. The court specifically instructed the jury that if they "perceived any variation between what [they] heard and what [they] read, [they] must be guided solely by the tape and not the transcript."

 The law is well-settled in the Tenth Circuit that it is not necessarily an abuse of discretion to allow transcripts to be used by a jury to clarify recorded conversations. See *United States v. Davis,* 929 F.2d 554, 559 (10th Cir.1991). In *United States v. Lucero,* 601 F.2d 1147, 1149–50 (10th Cir.1979), the court held that a jury may examine transcripts of

tape recordings if the trial court instructs the jury that the tapes and not the transcripts are the evidence and that the transcripts are provided only to assist their understanding of the tapes. See *Davis*, 929 F.2d at 559. The Tenth Circuit has further determined that allowing transcripts that identify the voices of the respective speakers is not an abuse of discretion. *Mayes*, 917 F.2d at 463; *United States v. Watson*, 594 F.2d 1330, 1336 n. 7 (10th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979).

The court is not persuaded that any error occurred here. The court allowed both the transcripts and the pictures to be used. In doing so, the court gave several instructions concerning their use. The court believes that the use of the transcripts and the pictures was proper and the instructions given were adequate. An adequate foundation for their consideration was laid by the government witnesses, and defense counsel had ample opportunity to cross-examine the witnesses to discredit the transcripts.

*SUSTAINING OBJECTIONS TO QUESTIONS CONCERNING WHETHER SKINNER HAD EVER PREVIOUSLY BEEN AN INFORMANT* (Pickard's issue 32) (Apperson's issue 28)

The defendants contend that the court erred in sustaining objections to questions about Skinner's prior activities as an informant. This issue was raised in motions in limine filed by the government. The court ruled that no mention could be made of Skinner's informant activities in the Worthy case. The court had found that the probative value of this evidence was outweighed by its prejudicial effect. Defense counsel continued to make efforts to elicit testimony concerning this case at trial. The government made objections and the court sustained them. The defendants sought to inquire about other times Skinner had served as an informant. The government indicated it was only aware of one other instance where Skinner had been an informant and that was related to the Worthy case. The government provided the court with Skinner's DEA informant file and suggested that the court conduct an in camera review to determine if there were any other occasions where Skinner had served as an informant. The court discovered no other instances in the file. Based upon the representations of the government and the review of Skinner's informant file, the court determined that no further inquiries could be made concerning Skinner's work as an informant.

The defendants have offered nothing to show how the court erred in this conclusion. The defendants have failed to demonstrate the relevance of this evidence. Moreover, they failed to note any prejudice they suffered from the court's rulings. In sum, the court finds that this contention does not justify a new trial.

*NOT ALLOWING ADDITIONAL FACTUAL PRESENTATION OR ARGUMENT AFTER JURY ANNOUNCED VERDICT* (Pickard's issue 59)

Pickard contends that the court erred in not allowing further presentation of facts and argument on his motion to dismiss based upon outrageous government conduct or prosecutorial misconduct after the court learned that the jury had reached a verdict.

Pickard first raised concerns about outrageous government conduct and prosecutorial misconduct on March 6, 2003. At that time, Pickard advised the court that he wanted to present the testimony of Skinner. He noted that Skinner would address several issues during his testimony. The court scheduled a hearing for the next day and indicated that the parties would need to supply the court with some briefs on the legal issues raised by Pickard. The court did hear testimony from

Skinner on March 7, 2003. Pickard filed his motion to dismiss based upon outrageous government conduct and prosecutorial misconduct or, in the alternative, for a mistrial on March 12, 2003. The court indicated to the parties that the issues raised by the defendant's motion would be revisited after all of the evidence in the case was received.

The court eventually informed counsel that these matters would be considered after final argument. The court conducted a hearing on March 31, 2003. During the course of this hearing, the court received and replied to questions from the jury. Following what the court believed was the end of the arguments on this motion and during work on a request from the jury to receive indices of the exhibits that were admitted, the court was informed the jury had reached a verdict. The court informed the parties of this event. The government requested the court rule on the pending motion. The court was prepared to do so and had planned to do so. Accordingly, the court orally denied the motion. The court then issued a written order on April 4, 2003.

Frankly, the court is puzzled by this argument. The court believed that the defendants had presented everything they desired to present on these issues. The defendants *never advised the court they had additional evidence or argument they desired to provide.* They never sought additional time to file briefs, even though the court stated that it intended to file a written order on these issues. Finally, they never sought reconsideration after the court entered its order based upon an argument that they had more to say or present. Moreover, the defendants have now failed to suggest what they might have presented or argued.

In sum, the court does not believe that any error occurred. Even if it did, we do not find that the defendant has demonstrated that he was prejudiced by it. This claim provides no basis for relief.

## DENYING IMMUNITY TO KRYSTAL COLE AND RYAN OVERTON (Pickard's issue 66)

Pickard contends that the court erred in not giving immunity to two witnesses that he called, Krystal Cole and Ryan Overton, who refused to testify based upon the Fifth Amendment privilege against self-incrimination. The court exhaustively considered this argument at trial, but we will briefly restate the basis of our rulings.

Cole and Overton were called by Pickard to testify. The court appointed counsel to represent both of them when they suggested that they intended to invoke their Fifth Amendment rights. After discussions with their counsel, they indicated that they did indeed wish to invoke their Fifth Amendment rights. The court conducted hearings outside the presence of the jury on these witnesses and ultimately released them based on the invocation of rights against self-incrimination.

■■■■ In *United States v. Chalan,* 812 F.2d 1302, 1309–10 (10th Cir.1987), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988), the Tenth Circuit summarized a witness' Fifth Amendment right as follows:

The Fifth Amendment states in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A witness' privilege not to answer incriminating questions has been liberally construed. For example, in *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Supreme Court declared that the privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link

in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486, 71 S.Ct. at 818; see also *United States v. Jones,* 703 F.2d 473, 475 (10th Cir.1983). In addition, the claimant should not be required to establish the basis for the privilege "in the sense in which a claim is usually required to be established in court"; otherwise, the witness "would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818. The Court in Hoffman also stated that

"[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'"

*Id.* at 486–87, 71 S.Ct. at 818 (quoting *Ex parte Irvine,* 74 F. 954, 960 (C.C.S.D.Ohio 1896)). A trial judge should order the witness to answer questions only if it is " 'perfectly clear, from a careful consideration of all the circumstances in the case, ... that the answer[s] cannot possibly' " tend to incriminate the witness. *Id.* at 488, 71 S.Ct. at 819 (emphasis in original) (quoting *Temple v. Commonwealth,* 75 Va. 892, 898 (1881)); see also *United States v. Nunez,* 668 F.2d 1116, 1121 (10th Cir. 1981).

During the hearings, the court explored the nature of the testimony sought from these individuals and the basis for their invocation of Fifth Amendment rights. The court determined that each witness properly had the right to invoke the Fifth Amendment.

 The court was next forced to consider whether we needed to ask the government to provide these witness's with immunity. "The power to apply for immunity ... is the sole prerogative of the government being confined to the United States Attorney and his superior officers." *United States v. LaHue,* 261 F.3d 993, 1014 (10th Cir.2001) (quoting *United States v. Hunter,* 672 F.2d 815, 818 (10th Cir.1982)), cert. denied, 534 U.S. 1083, 122 S.Ct. 818, 151 L.Ed.2d 701 (2002). Accordingly, courts have no inherent authority to grant a witness use immunity. *Id.* If the government refuses to grant immunity, the court must consider whether the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process. *Id.* If it is, then the court can consider granting an acquittal. *Id.*

The court considered the aforementioned standards in determining that the witnesses were entitled to invoke the Fifth Amendment and that the denial to grant immunity by the government did not require acquittal of the defendants. The court stands by its earlier rulings. As we indicated to Pickard during trial, the court does not have power to grant immunity to the witnesses. Pickard's suggestion to the contrary is without any support in the Tenth Circuit. Accordingly, this claim provides no basis for a new trial.

## DENYING PRODUCTION OF WITNESSES PURSUANT TO FED. R.CRIM.P. 17(B) (Pickard's issue 79)

 Pickard contends that the court erred in denying the production of those witnesses requested pursuant to Fed. R.Crim.P. 17(b). This argument, much like most of the arguments made by the defendant, lacks specificity. The defendant has failed to identify which witnesses the court improperly denied production, why these decisions were incorrect, and

how they were prejudiced by the court's rulings.

This was one of those areas during the trial that caused the court some frustration. Pickard's counsel did not file a motion for production of witnesses until January 23, 2003, ten days after the beginning of the trial. He sought production of 24 witnesses. Thereafter, the court held an ex parte hearing to obtain additional information on the requested witnesses. Defense counsel provided some information, but acknowledged that he had not directly contacted many of the witnesses. The court directed counsel to make contacts and find out the nature of each witness's testimony. Despite efforts during the trial to return to this matter, the court was forced to delay it until defense counsel indicated that he had conducted the appropriate inquiries. Subsequently, after hearing some additional information, the court made rulings on the requested witnesses. The court granted 10 of the defendant's requests and denied 14 requests. The court denied subpoenas for six of the requested individuals because their proffered testimony appeared to be cumulative to that offered by the witnesses that had been allowed. The list of witnesses that were denied also included all of the witnesses that the defendant sought to use to support his public authority defense. The court noted at that time that defense counsel had acknowledged that he had not spoken with any of these individuals concerning their potential testimony. Later, after receiving some additional information from the defense counsel, the court allowed the issuance of three subpoenas to individuals who defense counsel asserted would support his public authority defense.

▬▬▬ An indigent defendant does not have an absolute right to subpoena witnesses at the government's expense. *United States v. Rogers*, 921 F.2d 1089, 1094 (10th Cir.1990), cert. denied, 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 985 (1991); *United States v. Julian*, 469 F.2d 371, 374 (10th Cir.1972). Rule 17(b) requires a court to issue a subpoena when the witness' presence "is necessary to an adequate defense." Fed.R.Crim.P. 17(b). In this context, " '[n]ecessary' means 'relevant, material and useful.' " *United States v. Hernandez–Urista*, 9 F.3d 82, 84 (10th Cir.1993) (quoting *United States v. Gallagher*, 620 F.2d 797, 799 (10th Cir.), cert. denied, 449 U.S. 878, 101 S.Ct. 224, 66 L.Ed.2d 100 (1980)). The burden is with the defendant to demonstrate particularized need. *Hernandez–Urista*, 9 F.3d at 84. This typically entails specific averments concerning the substance of the witness' testimony. *United States v. Bloomgren*, 814 F.2d 580, 585 (10th Cir.1987).

▬▬▬ In deciding whether to issue a Rule 17(b) subpoena, the trial court enjoys wide discretion. *United States v. Butler*, 988 F.2d 537, 540 (5th Cir.), cert. denied, 510 U.S. 956, 114 S.Ct. 413, 126 L.Ed.2d 359 (1993); *United States v. Moore*, 917 F.2d 215, 230 (6th Cir.1990), cert. denied, 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991). The trial court should give due consideration to the defendant's constitutional rights under the Fifth and Sixth Amendments. *United States v. Greschner*, 802 F.2d at 373, 378 (10th Cir.1986), cert. denied, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). The exercise of that discretion is reversible only when " 'the exceptional circumstances of the case indicate that defendant's right to a complete, fair and adequate trial is jeopardized.' " *Moore*, 917 F.2d at 230 (quoting *Terlikowski v. United States*, 379 F.2d 501, 508 (8th Cir.)), cert. denied, 389 U.S. 1008, 88 S.Ct. 569, 575, 19 L.Ed.2d 604 (1967). A trial court may properly refuse to issue a subpoena when the defendant fails to set forth the expected testimony of a witness, *Hernandez–Urista*, 9 F.3d at 84; when the

witness would offer only cumulative testimony, *Bloomgren*, 814 F.2d at 585; when the defendant fails to make a satisfactory showing of necessity, *Rogers*, 921 F.2d at 1094; when the defendant's request is untimely, see *United States v. Stoker*, 522 F.2d 576, 579 (10th Cir.1975); or when the issuance of a subpoena would otherwise constitute an abusive or unreasonable use of process, *United States v. Sims*, 637 F.2d 625, 629 (9th Cir.1980).

In evaluating the requests for subpoenas under Rule 17(b) made by the defendant, the court made every effort to give the defendant the benefit of the doubt. Even though the representations made by defense counsel were vague, the court carefully considered each request and attempted to provide the defendant with as many witnesses as possible. The court encouraged the defendant to seek other witnesses if he needed them. The court believes that it ruled correctly on all of the requests made by the defendant and, in some instances, may have leaned too far in favor of the defendant in ordering the issuance of some of the subpoenas. The court finds no reason to grant a new trial based on this argument.

*DENYING OBJECTIONS DURING CLOSING ARGUMENT WHEN THE DEFENDANTS WERE REFERRED TO AS "SCHMUCKS"* (Pickard's issue 90)

 The defendants contend that the court erred when it denied their objections to the government's referral to them as "schmucks." During closing argument, counsel for the government said that Pickard "was not some public policy schmuck." This brought an objection from the defendants. The court overruled the objection.

 Improper statements by a prosecutor warrant a new trial only where they influenced the jury's verdict. *United States v. Broomfield*, 201 F.3d 1270, 1276–77 (10th Cir.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000). A

conviction should not be easily overturned on the basis of a prosecutor's comments standing alone because the statements must be viewed in context, including the strength of the evidence against the defendant, whether curative instructions were given, and whether the prosecution was responding to an attack made by defense counsel. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Oles*, 994 F.2d 1519, 1524 (10th Cir.1993).

The court finds no merit to this argument. The court fails to find that this comment had any prejudicial impact here. First, government's counsel never suggested that the defendants were "schmucks." Rather, his statement applied only to Pickard and he clearly stated that Pickard "was **not** some public policy schmuck." He was suggesting that Pickard was not as he had represented during his testimony but was in fact an experienced and successful LSD chemist. In his response to the instant motion, government's counsel has indicated that he intended to say that Pickard "was not a public policy wonk." He has suggested that he committed an "innocent 'Freudian slip.'" The court continues to believe that the comment was not improper. The government was commenting on the testimony of the defendant, and we believe that it was a fair comment. Second, even if the comment was improper, the court instructed the jury that statements of counsel were not evidence. Finally, given the extraordinary weight of evidence against the defendant, we believe that the comment had little prejudicial impact, even if it was improper.

*NOT ALLOWING TRANSCRIPTION OF TESTIMONY DURING TRIAL* (Pickard's issue 93)

 Pickard contends that the court erred by not allowing him to have transcripts of the trial proceedings during trial

"for purposes of cross-examination, closing argument, or the like." During the early part of the trial, Pickard sought the transcription of the testimony of one of the government's early witnesses, Ralph Sorrell. He also sought a daily transcript of Skinner's testimony. The court denied both requests.

■ An indigent defendant may obtain services, other than counsel, necessary for their representation through an ex parte application to the court. 18 U.S.C. § 3006A(e)(1). In order to obtain services under § 3006A, a defendant must demonstrate that he is "financially unable" to obtain the services and that the services are "necessary" for an adequate defense. *United States v. Greschner*, 802 F.2d @ 376.

■ The services available pursuant to § 3006A(e)(1) include, if necessity is shown, daily transcripts. *United States v. Bari*, 750 F.2d 1169, 1181–82 (2nd Cir. 1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). The decision whether to allow an indigent defendant daily transcripts lies within the discretion of the court. *Id.* at 1181.

The court continues to believe that the defendant's motion was decided correctly. The defendant did not demonstrate and has not demonstrated why daily transcripts were necessary for an effective defense. Moreover, the defendant has failed to show how he was prejudiced by the court's denial of his motion. Accordingly, the court finds that this argument provides no basis for a new trial.

## DENYING A MISTRIAL BECAUSE THE GOVERNMENT PROSECUTOR AND CASE AGENTS MADE NOISES OR FACES DURING CERTAIN TRIAL TESTIMONY (Pickard's issue 84) (Apperson's issue 56)

■ The defendants contend that the court erred in not granting a mistrial after the prosecutor and case agents made faces or noises during certain trial testimony. The defendants suggest that these expressions and noises were visible and audible to the jury.

On two occasions during the trial, the defendants informed the court that either the prosecutor or his case agents or both had been making noises, laughing or making facial expressions where the jury could see or hear them during the testimony offered by witnesses. The court did not see or hear anything because the court's podium limits the view of the government's table. Upon the first notice, the court informed the prosecutor that no such conduct would be tolerated in the courtroom. The court reiterated that comment when it was again brought to the attention of the court.

The court believes that the conduct noted by the defendants was extremely limited. It was not loud enough for the court to hear, and we do not believe that the jury was tainted by any of these actions. Moreover, we believe that the court's instructions may have removed any prejudice caused by this conduct. In sum, the court continues to believe that a mistrial was not necessary under the circumstances.

## DENYING MISTRIAL/DISMISSAL AT VARIOUS TIMES DURING THE TRIAL (Pickard's issue 26) (Apperson's issue 55)

The defendants contend that the court erred each time it denied a motion to dismiss or, in the alternative, for a mistrial during the trial. The defendants have failed to point to any specific examples and have failed to offer any factual or legal support for this claim.

■ The decision to grant or deny a mistrial rests within the discretion of the district court because that court is best

situated to evaluate the effect of alleged improper conduct or actions. *United States v. Peveto*, 881 F.2d 844, 859 (10th Cir.), cert. denied, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). A mistrial may only be granted where a defendant's right to a fair and impartial trial has been impaired. *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir.2002).

On each occasion where the defendants sought dismissal or a mistrial, the court carefully considered the circumstances and determined (1) whether any misconduct had occurred, and (2) whether the defendants' right to a fair and impartial trial had been impaired. The court found no instances where these two events had transpired. Accordingly, the court denied each motion. The court continues to believe that we correctly decided those motions.

### DENYING MOTION TO BE PROVIDED GOVERNMENT'S EXHIBITS PRIOR TO/DURING TRIAL (Apperson's issue 5)

Apperson contends that the court erred in denying his motion to be provided with copies of the government's exhibits prior to and/or during trial. The court notes initially that he has failed to articulate how he was prejudiced by the court's decisions. The court is not persuaded that a new trial is required based upon this claim.

### DENYING SEVERANCE (Apperson's issue 1)

Apperson contends that the court erred in denying his motions for severance. He made a pretrial motion for severance and several requests for severance during the trial.

The court carefully considered Apperson's pretrial motion for severance in its order of February 19, 2002. At that time, defendant sought a continuance because: (1) he needed to obtain exculpatory testimony from Pickard; (2) a *Bruton* problem

may exist; and (3) there is an imbalance of evidence against the two defendants. The court rejected each of the arguments raised by the defendant. Of course, the first two problems noted by Apperson did not arise because Pickard did indeed testify at trial. The final issue was not a significant problem either because the evidence adduced at trial did not establish an extreme disparity in the evidence. The evidence showed significant involvement by Apperson in the conspiracy. In sum, the court continues to believe that the pretrial motion was properly decided.

During the trial, Apperson sought severance on several occasions. Most of these instances resulted from comments made by the court directed at counsel for Pickard. Apperson argued that he was prejudiced by these comments and believed that severance was the appropriate response by the court.

For the reasons stated above, the court does not believe that the comments made during the trial were improper. Moreover, the court does not find, even if some of the comments were improper, that Apperson was prejudiced by them. In sum, the court remains persuaded that severance was not required in this case.

### TESTIMONY BY SKINNER CONCERNING HANDWRITING OF PICKARD (Apperson's issue 22)

Apperson contends that the court erred by allowing Skinner to testify that certain notes and letters were written by Pickard. Apperson argues that this testimony was allowed without sufficient foundation.

Skinner identified several examples of Pickard's handwriting during his testimony. He indicated that, based upon his past association with Pickard, he was familiar with his handwriting.

The court allowed this testimony under Fed.R.Evid. 701 and 901(b)(2). See *United States v. Scott*, 270 F.3d 30, 48–9 (1st

Cir.2001), cert. denied, 535 U.S. 1007, 122 S.Ct. 1583, 152 L.Ed.2d 501 (2002). The court found that sufficient foundation had been laid for the introduction of this testimony. The court continues to believe that an adequate foundation was laid for this testimony.

*CUMULATIVE ERROR* (Pickard's issue 51) (Apperson's issue 49)

■ Finally, the defendants contend that the cumulative errors of the court warrant a new trial. "[C]umulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.1990). Because the defendants have not shown any individual errors, they cannot prevail on their claim of cumulative error.

In sum, the court finds no basis to grant the defendants a new trial. The court cannot unequivocally say that the defendants' trial was error-free, but we are persuaded that it was fair. The Constitution entitles a defendant to a fair trial, not a perfect one. *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Accordingly, the court shall deny the defendants' motions for new trial.

**IT IS THEREFORE ORDERED** that defendant Pickard's renewed motion for judgment of acquittal (Doc. # 341) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Pickard's motion for new trial (Doc. # 342) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Apperson's motion for new trial (Doc. # 343) be hereby denied.

**IT IS SO ORDERED.**