UNITED STATES of America, Plaintiff–Appellee,

v.

John Robert HARRISON, Defendant–Appellant.

No. 89–5156.

United States Court of Appeals, Tenth Circuit.

Aug. 19, 1991.

Lawrence E. Besser (Bill Clay, P.A., with him on the brief), Miami, Fla., for defendant-appellant.

David E. O'Meilla, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him on the brief), Tulsa, Okl., for plaintiff-appellee.

Before SEYMOUR, MOORE and BRORBY, Circuit Judges.

SEYMOUR, Circuit Judge.

John R. Harrison was indicted in 1988 along with ten other defendants for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846 (1988). Harrison also was charged with interstate travel to facilitate a narcotics enterprise in violation of 18 U.S.C. § 1952 (1988). The indictment alleged that the cocaine conspiracy began in August 1984 and continued to about February 1988 in Tulsa, Oklahoma. The alleged conspiracy revolved around unindicted co-conspirator, Charles "Chuck" F. Seelye, a local Tulsa businessman who was the distributor for various sources of cocaine. Harrison was charged with supplying Seelye with cocaine on several occasions between June 1985 and June 1986. All of his co-defendants pled guilty, and Harrison was tried alone. He was convicted on both counts and sentenced to twenty years under the sentencing guidelines. He appeals both his conspiracy conviction and his sentence, alleging numerous errors on the part of the district court. After careful consideration of the record and Harrison's

arguments, we affirm his conviction and remand for a new sentencing.

## I.

When reciting the facts of this case, we view the evidence from the perspective that tends to support the jury's verdict. *United States v. Wright*, 932 F.2d 868, 872 (10th Cir.1991).

Chuck Seelye began distributing cocaine in Tulsa in the early eighties, purchasing ounces of cocaine from his ex-high school classmate, Robert Hardcastle, on numerous occasions between 1980 and 1982. Over the course of a year and a half, Seelye bought eight to twelve ounces from Hardcastle. In the spring or summer of 1984, Seelye stopped buying his cocaine from Hardcastle and began purchasing cocaine from Lester Suarez because Suarez's cocaine was of a better quality. Seelye and Suarez initially dealt in one-ounce transactions and then gradually increased their transactions to four-ounce purchases. In the summer of 1985, Seelye stopped buying cocaine from Suarez because he found an even better quality product at a much cheaper price from Terry Thomas. The first transaction between Thomas and Seelye occurred at Thomas' house on Grand Lake, outside of Tulsa, and involved a one-kilo purchase, which Seelye split with Carl Dawson. Present at Thomas' house were Seelye, Dawson, Thomas and Hardcastle, along with David Ferris, who had sold the cocaine to Thomas. Ferris had bought the cocaine from defendant Harrison as part of a five-kilogram deal. Harrison's source, on the other hand, was William Wood. Wood had sold the cocaine to Harrison through Michael Stanton, who delivered it to Harrison at the Columbia, Missouri Regional Airport. Both Wood and Harrison had then flown the cocaine into Oklahoma. Between June and November 1985, Seelye made approximately five purchases from Thomas, the first four in the eight-ounce to one-pound range, with the final purchase totalling a full kilogram. This cocaine also was supplied to Thomas by Harrison.

In December 1985, Robert Younger told Seelye that he knew Thomas' source and that he could strike a better deal with that source. Seelye agreed to do business with Younger and they traveled to Fort Lauderdale to purchase cocaine directly from Thomas' source, thereby eliminating Thomas as a middleman. Although Seelye was unaware of the identity of the source, other than by the name "Red," the source was, in fact, Harrison. Seelye made one three-kilo buy with the help of Younger. At the end of December 1985, Seelye and David Ferris[1] traveled to the Holiday Inn at the Caulder Race Track in Miami to buy three kilos of cocaine from Harrison. The actual transaction took place a couple of days later on January 2, 1986 at a Howard Johnson's Motel in Key Largo. Subsequent to this deal, Seelye bought cocaine from Harrison through Ferris four or five more times at the same Howard Johnson's.

In the summer of 1986, Seelye met Ferris and Ferris' associate, Casey Karney, at Howard Johnson's in order to consummate another deal with Harrison. For some reason, however, the cocaine that Harrison delivered was unsatisfactory to Seelye and he refused to buy it. Seelye testified: "The last transaction with John didn't turn out. What happened was, we went down there to do a deal with John, and he wasn't capable or able or willing for one reason or another." Rec., vol. IV, at 199. Harrison then informed Ferris of an alternative source, an ex-college football teammate of theirs, Kelley Hostetler. This was the final contact between Harrison and Seelye. Seelye and Ferris contacted Hostetler later that day and bought three kilos from him. Seelye purchased three- to four-kilo quantities of cocaine from Hostetler through Karney on several subsequent occasions.

Then, sometime in 1987, Jack Simpson came by Seelye's liquor store in Tulsa "out of the clear blue sky" and informed Seelye that he could supply cocaine at a price

---

**1.** Although Ferris had been present at Terry Thomas' house during the summer 1985 transaction, Seelye did not know at that time who he was. Seelye testified that he was not sure how he eventually got connected with Ferris.

cheaper than that of any of Seelye's previous suppliers. Rec., vol. V, at 363. Seelye stopped buying his cocaine from Hostetler and started to deal with Simpson. He conducted approximately four transactions with Simpson before he stopped selling cocaine in December 1987. Gayle Simon, one of Seelye's buyers, resold Seelye's cocaine into 1988. Seelye turned himself in sometime in early January 1988.

## II.

Harrison first argues that a material variance occurred because the proof at trial evidenced multiple conspiracies rather than the single conspiracy alleged in the indictment. Specifically, he alleges that the evidence showed six separate conspiracies, each centering around a different supplier, with Seelye as the only common participant. He argues that he was substantially prejudiced by the testimony recounting conspiracies in which he was not a member because of the likelihood that the jury attributed that evidence to him in its deliberations.

The government responds that a variance did not occur because Harrison's activities showed his participation in a broad conspiracy to distribute cocaine from Florida to Oklahoma through the common "hub" Seelye. Due to his participation from 1985 to 1986 in what the government labels the "Seelye Cocaine Network," Harrison is assertedly a co-conspirator with, and responsible for the actions of, all the individuals with whom Seelye dealt from 1984 through 1988, as outlined in the indictment.

In order to prove that Harrison was guilty of conspiracy, the government must prove that he conspired with at least one other person to violate the law, that he knew the purpose of the conspiracy, and that he knowingly and voluntarily became a participant in it. *United States v. Williams*, 923 F.2d 1397, 1402 (10th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991). When the question is not whether the defendant was guilty of a conspiracy, but rather whether she or he was a member of the one, broad conspiracy alleged in the indictment or, of a smaller, separate conspiracy contained within that indictment, our analysis must necessarily focus on the definition of "conspiracy."

"The core of a conspiracy is an agreement to commit an unlawful act." *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir.1991); *see also United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) ("The essence of a conspiracy is an agreement."), *cert. denied*, —— U.S. ——, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990). To find a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged co-conspirators' agreement encompassed a common, illicit goal. *See United States v. Dickey*, 736 F.2d 571, 582 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Thus, in order to establish that Harrison was a member of the broad, single conspiracy alleged, "the government must sufficiently prove that he had a 'unity of purpose or a common design and understanding' with his co-conspirators to possess with the intent to distribute and to distribute cocaine." *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990) (quoting *United States v. Kendall*, 766 F.2d 1426, 1531 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986)). It is therefore necessary " 'to determine what kind of agreement or understanding existed *as to each* [conspirator],' " *United States v. Record*, 873 F.2d 1363, 1368 (10th Cir.1989) (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) (emphasis added)), and for the government to establish with respect to that conspirator that " 'the essential element of interdependence' " existed among the conspirator and her or his alleged co-conspirators, *Fox*, 902 F.2d at 1514 (quoting *Dickey*, 736 F.2d at 582.); *see also United States v. Varelli*, 407 F.2d 735, 743 (7th Cir.1969) (in order to be part of conspiracy defendant must promote venture and make it her or his own). This is because "guilt remains individual and personal, even as respects conspiracies,

and is not a matter of mass application." *Fox*, 902 F.2d at 1514; *see also United States v. Kotteakas*, 328 U.S. 750, 772, 66 S.Ct. 1239, 1251, 90 L.Ed. 1557 (1946).

As we recently stated in *United States v. Daily*, 921 F.2d 994 (10th Cir.1990),

> "[a]s to the existence of a single conspiracy, *the focal point* of the analysis is whether the alleged co-conspirators were *united in a common unlawful goal or purpose. Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence.* In other words, of principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were *necessary or advantageous* to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole."

*Id.* at 1007 (emphasis added) (citations omitted).

> "The goals of all the participants need not be congruent for a single conspiracy to exist, *so long as their goals are not at cross purposes*.... Finally, a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, *so long as there is sufficient proof of mutual dependence and assistance.*"

*United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990) (emphasis added), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *see also United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Glenn*, 828 F.2d 855, 859 (1st Cir.1987); W. LaFave & A. Scott, Jr., *Handbook on Criminal Law* § 62, at 470 (1972). ("Several persons may be parties to a single conspiracy even if they have never directly communicated with one another; the question is whether they are aware of each other's participation in a general way *and have a community of interest.*" (emphasis added)).

Although we have held that the existence of many separate transactions among various co-conspirators does not necessarily establish the existence of separate conspiracies, *Dickey*, 736 F.2d at 582, we also have recognized that "[w]here various parties conspire with one common conspirator, the evidence may nevertheless show that separate conspiracies were involved and that no one combination embraced the objectives of the others," *United States v. Martinez*, 562 F.2d 633, 638 (10th Cir.1977); *see also United States v. Tramunti*, 513 F.2d 1087, 1106 (2d Cir.1975) (sale of narcotics by two organizations to common distributor not enough to prove single conspiracy consisting of both organizations), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Butler*, 494 F.2d 1246, 1255 (10th Cir.1974). In *Butler*, 494 F.2d at 1257, we stated that "[w]e [could] envision circumstances where what has been alleged as one conspiracy is disclosed at trial to be several repetitive conspiracies in which there is a substantial identity of parties and method."

We conclude that these circumstances are present here. Based upon the evidence presented at trial, we are convinced as a matter of law that the government overdrew the indictment to include three separate conspiracies—the first consisting of Lester Suarez and Chuck Seelye, the second consisting of Harrison, Terry Thomas, Robert Younger, David Ferris, William Wood, Casey Karney, Kelly Hostetler and Seelye, and the third consisting of Jack Simpson and Seelye. Although the general objective of each of these three conspiracies was the same, *i.e.*, to distribute cocaine for profit, it is clear from the record that the activities of these three different sources for Seelye's network were not interdependent within the meaning of our cases. *See, e.g., Daily*, 921 F.2d at 1007 (citing cases).

Seelye testified that he stopped purchasing cocaine from Suarez because Terry Thomas offered him a better deal. The Harrison/Thomas source thus obtained Seelye's business at Suarez' expense by offering higher quality cocaine at a lower

price. To the extent the Harrison/Thomas source was able to secure Seelye as a retailer to the exclusion of Suarez, Suarez was unable to continue his conspiracy with Seelye. The same can be said of the relationship between Jack Simpson and Harrison's group. Simpson cannot be said to have had an agreement with Harrison, implicit or otherwise, to achieve a common illicit goal of profiting from drug distribution when Simpson's efforts convinced Seelye to terminate the agreement to buy cocaine from the Harrison group. *See Glenn,* 828 F.2d at 858 ("[W]hen the distributor is indifferent to the purposes of others in the enterprise—say, other distributors,—the tacit understanding does not exist."); *see also Kotteakos,* 328 U.S. at 754–55, 66 S.Ct. at 1242–43. As the government notes, Harrison "was dropped because of quality, cost and availability considerations." Brief of Appellee, at 12. Thus, while the objectives of the conspiracies were *identical,* they were not *in common.* Rather than establishing that the infusion of cocaine to Seelye from one source was necessary or advantageous to the other sources, the evidence shows that each source was in direct competition with the one preceding it. The activities of each source therefore were not advantageous to the success of the other sources nor were they " 'essential and integral steps toward the realization of a *common* illicit goal.' " *Esparsen,* 930 F.2d at 1472 (quoting *Dickey,* 736 F.2d at 582) (emphasis added). As the Supreme Court said in *Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947), in distinguishing *Kotteakos,*

> "no two of those agreements were *tied together as stages in the formation of a larger all-inclusive combination,* all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end."

(emphasis added); *see also United States v. Wilshire Oil Co.,* 427 F.2d 969, 976 (10th Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). In this way, the situation here is diametrically opposed to the circumstances in cases such as *Dickey, supra,* where we found a single conspiracy due to the fact that

> "the success of the overall scheme of distributing drugs for profit depended upon the successful completion of each of the transactions [between the various defendants]. Even the remote members of the conspiracy were undeniably dependent on the success of each transaction to ensure the continuing prosperity of the overall scheme. *The success of each transaction was essential to attain ultimate goal of profitability.*

736 F.2d at 582 (emphasis added).

■ Of course, that Harrison no longer supplied Seelye with cocaine after the summer of 1986 is not dispositive of whether Harrison was a member of a conspiracy that continued into 1988. Indeed, we have acknowledged that a " 'turnover,' much less a change by one, in personnel does not terminate a conspiracy." *Record,* 873 F.2d at 1368 (quoting *United States v. Brewer,* 630 F.2d 795, 800 (10th Cir.1980)). Rather, it is when interdependence among alleged co-conspirators cannot be shown that we must recognize the existence of separate conspiracies. In *Record,* as here, other conspirators continued their activities after excluding the defendant from active participation due to the other conspirators' dissatisfaction with his performance. *See* 873 F.2d at 1368. However, in that case, as opposed to the one before us, the necessary interdependence among the defendant and the conspirators who carried on the drug importation was shown. The conspiracy there was able to continue because Record introduced to his co-conspirators the conspirator who assumed Record's role in the enterprise after his exclusion. *Id.* at 1369. Moreover, Record had recruited another of the conspirators who continued to participate in drug trafficking with Record's co-conspirators after Record was excluded. *Id.* Consequently, the continuance of the conspiracy depended in part upon Record's actions before he ended his participation, and his activities thereby furthered the common goal of his co-conspirators to make a profit from drug distribution.

Similarly, in *United States v. Brewer*, 630 F.2d 795 (10th Cir.1980), we held that the exclusion of a middleman, John McPhail, by co-defendant buyer Billy Burns, did not constitute the creation of a new conspiracy to distribute amphetamines of which McPhail was not a member, because the members of the distribution chain otherwise remained the same and McPhail had initiated the search for the sources with whom Burns eventually dealt directly. *Id.* at 800. Additional interdependence was shown through the inference that Burns was able to locate McPhail's source through McPhail himself.[2] Significantly, the government in *Brewer* conceded that a separate conspiracy did exist when Burn's source, Robert D. Henderson, absconded with amphetamines that had been supplied to him by Robert and Richard Brewer and Red Cain to sell to Burns, and sold them instead to Bill Reeder. Like the relationship among the three conspiracies in this case, the Henderson/Reeder agreement obviously was independent of the Brewer/Cain/Henderson agreement, and, thus, the court determined that they were separate conspiracies despite the common membership of Henderson.

Because the record here evidences three separate conspiracies, each with a mutually exclusive agreement of its own, we agree with Harrison that there existed a variance between the indictment and the proof offered at trial.

■ A variance does not require reversal, however, unless the defendant can show that it affected her or his substantial rights. *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48; *Wright*, 932 F.2d at 874; *United States v. Rinke*, 778 F.2d 581, 590 (10th Cir.1985). A defendant's substantial rights are not prejudiced merely because the "defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully

included within the indictment." *United States v. Mobile Materials*, 881 F.2d 866, 874 (10th Cir.1989) (construing *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); *see Wright*, 932 F.2d at 874. On the other hand, a variance does affect substantially the defendant's right to a fair trial if "the evidence adduced against co-[conspirators] involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt." *Wright*, 932 F.2d at 874 (citing *Kotteakos*, 328 U.S. at 764–77, 66 S.Ct. at 1247–49); *see United States v. Morris*, 623 F.2d 145, 149 (10th Cir.), *cert. denied*, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980). In assessing the prejudicial spillover effect of the evidence pertaining to conspiracies in which defendant was not a part, we review the record to see

"*First*, whether the proliferation of separate crimes or conspiracies presented in the case impaired the jury's ability to segregate each individual [conspirator's] actions and the evidence associated with [her or] his participation; *Second*, whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance; and, *Third*, the strength or weakness of the evidence underlying the jury's conviction."

*United States v. Morris*, 623 F.2d at 149; *see Wright*, 932 F.2d at 875–76.

In this case, the evidence regarding the Suarez and Simpson conspiracies was sufficiently narrow and insignificant compared to the overwhelming evidence offered with respect to the conspiracy in which Harrison *was* a member to convince us that it is unlikely that any prejudicial spillover occurred at all. Additionally, Seelye's testimony concerning his transactions with Harrison was corroborated by a number of

---

**2.** The logic of *Record* and *Brewer* supports our conclusion that Harrison was a member of the conspiracy that included Karney and Hostetler, even though he personally had stopped distributing cocaine to Seelye prior to their involvement. This conclusion is predicated on the fact

that it was Harrison who put Seelye in contact with Hostetler. This connection establishes a mutual interdependence not present in relation to the Suarez/Seelye or Simpson/Seelye conspiracies.

Harrison's co-conspirators, as well as by extrinsic evidence. We therefore conclude that the variance did not affect defendant's right to a fair trial.

### III.

Harrison next argues that the district court erred by admitting testimony of co-conspirators William Wood and Michael Stanton under Fed.R.Evid. 404(b) that related to drug transactions outside the time frame of the indictment. He contends that their testimony was irrelevant to the conspiracy charge, arguing that neither his intent, knowledge or absence of mistake was at issue. The government responds that, first, Stanton did not testify as to other illegal conduct, but simply established that Wood and Harrison were acquaintances prior to the five-kilogram drug transaction involving Stanton, Wood, and Harrison in the summer of 1985. Second, Harrison's intent to enter into the drug conspiracy, an element that must be proven beyond a reasonable doubt, was directly at issue because he denied knowledge of any drug deals involving himself or between Wood and others, and testified that his plane trip with Wood and his associations with the various co-defendants revolved around legitimate business transactions.

 Whether evidence is relevant under Rule 404(b) is a determination within the discretion of the district court, and we will not disturb that determination absent a clear showing of abuse. *United States v. Cuch,* 842 F.2d 1173, 1175 (10th Cir.1988). If the district court concludes that the evidence is relevant, the court must then exercise its discretion to determine under Fed. R.Evid. 403 whether such evidence should still be excluded because its probative value is substantially outweighed by its prejudicial effect. *United States v. Temple,* 862 F.2d 821, 823 (10th Cir.1988); *Cuch,* 842 F.2d at 1175.

 Although evidence of other acts is not admissible to prove the defendant's predisposition to commit the crime charged, it may be admissible to prove her or his intent, knowledge, absence of mistake, or motive with respect to that crime. *Esparsen,* 930 F.2d at 1476; *Cuch,* 842 F.2d at 1175. However, "[i]t is essential when admitting evidence of prior acts that the court strive to avoid confusion and prejudice to the defendant." *Temple,* 862 F.2d at 824. This circuit has required that Rule 404(b) evidence meet stringent criteria before it will be admitted; namely it

> " '(1) must tend to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) must also be so related to the charge that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) must have real probative value, not just possible worth; and (4) must be close in time to the crime charged.' "

*Temple,* 862 F.2d at 823 (quoting *United States v. Morales–Quinones,* 812 F.2d 604, 612 (10th Cir.1987)).

 Furthermore, the government bears the burden of showing how a defendant's past acts are "relevant to an issue in the case by 'articulat[ing] precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.' " *United States v. Cardall,* 885 F.2d 656, 671 (10th Cir.1989) (quoting *Kendall,* 766 F.2d at 1436); *Cuch,* 842 F.2d at 1176; *see United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983). "There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried." *Biswell,* 700 F.2d at 1317–18. Moreover, the district court must identify a specific reason for admitting the evidence, rather than merely reciting the language of Rule 404(b).[3] *Cardall,* 885 F.2d at 671.

---

**3.** The requirement that the government and the trial court articulate precisely the basis for admission of similar "bad acts" is still applicable in this circuit after the Supreme Court's construction of Rule 404(b) in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). *See Cardall,* 885 F.2d at 671; *U.S. v.*

*Doran,* 882 F.2d 1511, 1523 (10th Cir.1989); *Record,* 873 F.2d at 1363 n. 7. However, we will consider the failure to adhere to this requirement harmless error when the purpose for the admission of the evidence is apparent from the record and the decision to admit it was correct. *Doran,* 882 F.2d at 1523–24.

■ Once the evidence has cleared these hurdles to admissibility, the court still must determine that the prejudicial effect of the evidence does not substantially outweigh its probative value. *Cuch*, 842 F.2d at 1176; *Temple*, 862 F.2d at 823; *Biswell*, 700 F.2d at 1318. Finally, it is preferable for the district court to instruct the jury as to the limited use of Rule 404(b) evidence, both at the time the evidence is admitted and in the court's final charge. *Cuch*, 842 F.2d at 1177; *see Esparsen*, 930 F.2d at 1476.

■ In this case, Harrison's intent to enter into the conspiracy is particularly relevant because intent is an element of conspiracy that must be proven beyond a reasonable doubt. *See United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir.1984). Faced with a plea of not guilty, the government need not await the defendant's denial of intent on the witness stand before offering evidence of similar relevant acts. *See id.; United States v. Roberts*, 619 F.2d 379, 383 (5th Cir.1980). Here, Harrison specifically placed his intent in issue by denying all knowledge of any drug dealing, either on his part or on the part of his acquaintances. Evidence of Harrison's long history of marijuana and cocaine trafficking with William Wood was therefore particularly probative of his state of mind during the drug transactions perpetrated over the course of this conspiracy. The government made it clear that this was the purpose for which Wood's testimony was introduced and the district court admitted it for that reason. Moreover, the ongoing drug relationship between Wood and Harrison from 1980 up to the 1985 transaction was reasonably close to and, in fact, extended into the time frame of the conspiracy charged. After hearing argument from both sides on the issues of relevance and prejudice, the district court admitted Wood's testimony. The court gave a limiting instruction requested by defense counsel, both at the time of the testimony and at the close of the case. Based on our review of the record, we do not believe the trial court abused its discretion by allowing the Rule 404(b) testimony of William Wood. As for Stanton's testimony, we agree with the government that he did not testify as to any prior bad acts of Harrison, and, thus, a 404(b) analysis with respect to his statements is not warranted.

### IV.

■ Harrison next contends that because the evidence showed that the conspiracy in which he was a member ended in the summer of 1986, well before the effective date of the sentencing guidelines on November 1, 1987, the court erred in applying the guidelines to his sentence.[4] We have concluded that a conspirator who ends active participation in a conspiracy prior to November 1, 1987, may nevertheless be subjected to the sentencing guidelines when the acts of her co-conspirators extend beyond this date. *See United States v. Williams*, 897 F.2d 1034, 1040 (10th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991).[5] Here, however, the government has offered no evidence that the conspiracy of which Harrison was a member extended beyond November 1, 1987.[6] The only evidence offered by the government to show conspiratorial activity by anyone beyond November 1, 1987, is testimony that a buyer of Seelye's sold cocaine in 1988. This cocaine was supplied by Seelye in December 1987, rec., vol. VII, at 36, after Seelye had termi-

---

**4.** Although the trial court stated it would give Harrison the same sentence (twenty years) if the guidelines did not apply, under pre-guideline sentencing, Harrison would be eligible for parole.

**5.** Unlike this case, in *Williams* the defendant did not contest the factual finding that the conspiracy of which she was a member extended beyond November 1, 1987. *See* 897 F.2d at 1040.

**6.** Even though we agree that the government did not shoulder its burden of proving that Harrison was a member of a conspiracy that continued past the effective date of the guidelines, we disagree with Harrison's analysis with respect to the scope of his agreement. As we discussed in Part II, Harrison's efforts on behalf of Hostetler made Harrison a member of the Karney/Hostetler/Seelye group. The government presented evidence that this conspiracy extended somewhere into 1987.

nated his conspiracy with the Harrison/Karney/Hostetler group and had begun the new conspiracy with Jack Simpson. The government simply has not met its burden of establishing that the Harrison conspiracy continued past the effective date of the sentencing guidelines. We therefore remand for resentencing.[7]

## V.

Harrison's conviction is affirmed. His sentence is vacated and the case is remanded for resentencing under pre-guideline standards.

---

7. Given our disposition on this issue, we need not address Harrison's numerous contentions of error with respect to sentencing under the guidelines.