**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 3 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

MORGAN EARL WINDRIX,

        Defendant - Appellant.

No. 04-5016

------------------------------------------------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee

v.

DAVID ALAN WESTCOTT,

        Defendant - Appellant.

No. 04-5020

------------------------------------------------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

CHARLES ARNOLD MOOK,

        Defendant - Appellant.

No. 04-5021

Case No. 04-5016:

Michael G. McGuire, Tulsa, Oklahoma, for Defendant - Appellant Windrix.

Kevin Danielson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the briefs), Tulsa, Oklahoma, for Plaintiff - Appellee.

Case No. 04-5020:

Art Fleak, Tulsa, Oklahoma, for Defendant - Appellant Westcott.

Shannon L. Henson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, and Kevin Danielson, Assistant United States Attorney, on the briefs), Tulsa, Oklahoma, for Plaintiff - Appellee.

Case No. 04-5021:

Stanley D. Monroe, Tulsa, Oklahoma, for Defendant - Appellant Mook.

Shannon L. Henson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, and Kevin Danielson, Assistant United States Attorney, on the briefs), Tulsa, Oklahoma, for Plaintiff - Appellee.

Before **BRISCOE** , **HOLLOWAY** , and **HARTZ** , Circuit Judges.

**HARTZ** , Circuit Judge.

These consolidated cases arise from the trial of three participants in a conspiracy to manufacture and sell methamphetamine. Defendants Morgan Earl Windrix, Charles Arnold Mook, and David Alan Westcott were each convicted of conspiring to manufacture and distribute methamphetamine, 21 U.S.C. § 846, and possessing equipment and chemicals for methamphetamine manufacturing, 21 U.S.C. § 843(a)(6). Windrix, the conspiracy's leader, was further convicted on two counts of possessing methamphetamine with the intent to distribute, 21 U.S.C. § 843, and maintaining a drug house, 21 U.S.C. § 856(a)(1), (b); Mook was further convicted of being a felon in possession of a firearm and ammunition, 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Each Defendant appeals the judgment on a number of grounds. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the convictions but remand for resentencing in light of *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005).

I.      **Background**

In July 1999 Windrix bought a fenced 10-acre hill property in Osage County, Oklahoma, on which he resided in a double-wide mobile home. Westcott, with his former wife Karen Heim, moved onto the property at Windrix's invitation, living in a single-wide mobile home. Mook, Windrix's nephew,

occasionally lived on the hill, but also maintained houses on South Xanthus and North Garrison Place in Tulsa.

Between 1999 and 2002 Windrix, Westcott, Mook, and others manufactured and distributed methamphetamine using Windrix's hill as their base. Windrix arranged methamphetamine-manufacturing sessions (cooks) at least twice a week and supervised the procurement of ingredients for these cooks. Westcott assisted during the cooks, purchased and produced ingredients, and destroyed evidence of the cooks. Mook assisted during the cooks and kept methamphetamine, business records, firearms, and ammunition in his South Xanthus and North Garrison Place houses.

On appeal Windrix contends that (1) the district court incorrectly failed to suppress evidence discovered during a May 10, 2002, traffic stop; (2) the Government proved multiple conspiracies rather than the single conspiracy with which he was charged; and (3) the district court incorrectly applied the Sentencing Guidelines by miscalculating drug quantities and imposing upward adjustments for firearm possession and for leading a criminal group of five or more.

Westcott contends that (1) the district court incorrectly failed to suppress evidence discovered during a February 6, 2001, search of his mobile home on the hill; (2) the government proved multiple conspiracies rather than the charged

conspiracy; (3) the district court abused its discretion by refusing to sever his trial from that of the other defendants; (4) the jury pool was not a fair cross-section of the community; (5) the district court misapplied the Sentencing Guidelines by attributing to him quantities of methamphetamine that flowed through the conspiracy but that he could not have reasonably been expected to foresee; and (6) the Government failed to prove for sentencing purposes that the quantities of methamphetamine attributed to him were pure methamphetamine rather than a mixture.

Mook contends that (1) the district court incorrectly failed to suppress evidence discovered in the February 6, 2001, search of the hill, the two September 23 searches of his residence, and the September 24 search of his storage lockers; (2) the Government proved multiple conspiracies rather than the single conspiracy with which it charged him; and (3) the district court incorrectly applied the Sentencing Guidelines by attributing to him quantities of methamphetamine that flowed through the conspiracy but that he could not have reasonably been expected to foresee.

All three also challenge their sentences under *Booker*.

## II.   Contested Searches and Seizures

Police officers conducted a number of searches during their investigation of the conspiracy.  Defendants challenge several of them on appeal.

On February 6, 2001, officers executed a search warrant of the Windrix property. The search included both trailers (Windrix's and Westcott's) on the hill. Officers discovered methamphetamine, ingredients and equipment for preparing methamphetamine, marijuana, several firearms, video surveillance equipment, a ballistic vest, night-vision scopes, walkie-talkies, a radio scanner, and large amounts of currency.

On May 15, 2001, another warrant was executed, this time for Mook's South Xanthus house. Officers discovered marijuana, a firearm, scales, syringes, gloves, methamphetamine pipes, receipts for methamphetamine-manufacturing ingredients and equipment, and large amounts of currency. A year later officers obtained further evidence—methamphetamine, ingredients, and a videotape of Windrix at a cook—in a May 10, 2002, search of Windrix's car after a traffic stop.

This prolonged investigation resulted in a September 6, 2002, indictment charging Defendants with conspiracy. On September 23, relying in part on the indictment, officers obtained and executed a warrant to search Mook's North Garrison house for documentary evidence of the conspiracy, and, after a fruitful search, a second warrant to search the house for methamphetamine-manufacturing equipment and other nondocumentary evidence. The North Garrison searches yielded financial records, bottles, filters, scales, smoking devices, marijuana,

firearms, ammunition, and large amounts of currency. During the first search, officers discovered a storage-locker receipt; they then obtained a warrant to search the storage locker, which they executed the following day. They found firearms, ammunition, paperwork, scales, glassware, plastic tubing, and a chemistry textbook.

We proceed to address the challenges to these searches. In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the Government and accept the district court's factual findings unless they are clearly erroneous, but review the ultimate question of Fourth Amendment reasonableness de novo. *See United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).

## A. February 6, 2001, Search of Westcott's Home

In January 2001 police officers obtained a search warrant for the hill. The warrant authorized the search to encompass "the dwelling, all outbuildings, vehicles and persons which may be found thereat." After providing directions to the property and stating that one enters the property on a road passing "through two rock pillars and [a]cross a cattle guard," the warrant described the property as follows:

> There is a white with brown trim mobile home setting in a
> north/south direction on the East Side of the entrance road. There is
> a white colored mobile home setting in an east/west direction, south
> of that location. There are numerous outbuildings on the property,

and there are numerous junk vehicles lined up on the west side of the entrance road.

On February 6, 2001, police officers executed the warrant, searching both mobile homes. Between the time the warrant was obtained and the time of the search, officers had been informed that Westcott occupied the second trailer. Westcott contends that the search was overbroad because officers did not have probable cause to search his home. We disagree.

In the affidavit supporting the warrant, investigator Mark Shea described the structures on the hill as including "a white with brown trim mobile home setting in a north/south direction on the East Side of the entrance road[,] . . . a white colored mobile home setting in an east/west direction, south of that location[,] . . . numerous outbuildings . . ., and . . . numerous junk vehicles . . . ." Search Warrant Affidavit at 1. The affidavit recounted Osage Nation police officer Dave Hinman's interview with criminal-turned-informant Ricky Devon McDoulett on December 19, 2000. In the interview McDoulett told Hinman that Windrix, whom he identified by a photograph, lived in one of the two mobile homes, had provided methamphetamine to him in exchange for work on cars, had a methamphetamine laboratory in the back bedroom of his residence, had cooked methamphetamine many times in McDoulett's presence, and had cooked methamphetamine with two unidentified males and an unidentified female all night on the day before the interview. McDoulett said that he had known Windrix

for 15 to 20 years and that Windrix had been dealing large amounts of methamphetamine for 10 years. McDoulett also said that Windrix had traded guns for methamphetamine, used wire detectors to scan people for transmitters or recorders, and used other persons to provide security during cooks. The same day as the Hinman interview McDoulett provided Tulsa police officers with information leading to two arrests for possession of methamphetamine with intent to distribute.

Shea added that on January 6, 2001, Osage County deputy Shannon Bradford and Osage Nation police chief Ron Teel conducted surveillance of the hill. As they were walking up the road to the property, they saw several cars parked on the roadway. A woman stepped out of one of the cars and said into a cell phone, "I think someone is here," after which a light began scanning the area and an ATV four wheeler began patrolling the road. Shea further reported that a concerned citizen said that he had seen much traffic and heard frequent gunfire on the hill. Shea noted that property records showed that Windrix owns the hill.

In addition, the affidavit stated that in October 2000 informant Wendy Chaalan had taken officer Brian Comfort to the hill and told him that Windrix conducts weekly multiple-pound cooks, that she had seen large amounts of methamphetamine and ingredients at Windrix's residence, that Windrix surrounded the hill with armed guards during cooks, and that Windrix used both

trailers and a barn to manufacture and sell methamphetamine. Two other informants had also told officers in December 2000 and January 2001 that Windrix was cooking methamphetamine at his trailer and had armed guards around the hill during cooks.

Recognizing that informant Chaalan specifically tied his trailer to the methamphetamine operation, Westcott contends that Chaalan's report was "vague, ambiguous, and unsubstantiated and uncorroborated." Westcott Aplt. Br. at 33. In particular, Westcott contends the report was vague and ambiguous because there were other "trailers"—"a large Graco travel trailer with a bed in it, and a dump trailer"—on the hill. Westcott Aplt. Br. at 34 (internal quotation marks and emphasis omitted). But in context the affidavit is clearly referring to the mobile homes when it mentions "trailers."

Chaalan's statement was sufficiently corroborated by other evidence indicating that the entire hill was used for a methamphetamine enterprise. We hold that the affidavit provided probable cause to search Westcott's mobile home.

B.     May 15, 2001, Search of the South Xanthus House

On May 15, 2001, police officers received a report of a possible methamphetamine lab at the South Xanthus house. Two officers investigated and detected "a strong chemical odor . . . only associated with the manufacturing of methamphetamine." Affidavit for Search Warrant (5/15/2001). A few hours

later, on the basis of an affidavit by one of the officers, an Oklahoma state judge issued a warrant to search the house. The officer–affiant had been certified by the federal Drug Enforcement Administration in the recognition of methamphetamine odors. Police officers executed the warrant the same day, discovering methamphetamine-manufacturing materials and other evidence of the conspiracy.

Mook contends that this search was not supported by probable cause, because humans cannot reliably identify odors. But we have repeatedly held in vehicle-search cases that "[a]n officer's detection of the smell of drugs, such as methamphetamine . . . can be an independently sufficient basis for probable cause." *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000) (collecting cases). We see no reason to limit these cases to vehicle searches: the scent of methamphetamine, wherever detected, gives qualified officers probable cause to search for methamphetamine and evidence of methamphetamine manufacturing.

Mook also complains that the affidavit for the warrant falsely states that Mary Gaye Fox, named as the defendant in the affidavit, had prior drug-related convictions. Even if the statement was false, however, the odor evidence clearly established probable cause, so the warrant was nevertheless valid. *See Mason v. United States*, 719 F.2d 1485, 1488 (10th Cir. 1983).

**C.    May 10, 2002, Vehicle Search**

On May 10, 2002, Windrix was pulled over for a traffic violation. A drug-detection dog sniffed his car and alerted. A police officer asked for Windrix's consent to search the car, but Windrix refused. Officers then took Windrix into custody and detained him at headquarters for four hours while they applied for and received a search warrant for the car. When officers eventually searched the car, they discovered methamphetamine and methamphetamine-manufacturing materials.

Windrix contends that his four-hour detention at police headquarters was unconstitutional and that the evidence discovered in the search of his car must therefore be suppressed. But we suppress evidence because of an unconstitutional arrest only when the evidence was discovered by exploitation of the arrest. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Windrix rightly concedes that "the arresting officers had probable cause to search [his] vehicle right . . . after the dog alert." Windrix's Aplt. Br. at 19. It was the dog alert, not the arrest or anything Windrix said or did during the arrest, that justified the search. The evidence was not discovered by exploitation of the arrest. Consequently, it was proper not to suppress the evidence, regardless of the constitutionality of the arrest. *See United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) (seizure of vehicle was not fruit of unlawful detention of occupants); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1166-67 (10th Cir.

1995) (burlap bags containing marijuana would not have been any less visible had car's occupants not been unlawfully arrested).

### D. September 23, 2002, Search of the North Garrison House

Mook challenges the September 23, 2002, search of his house on North Garrison, claiming that the affidavit for the search warrant failed to provide probable cause. We disagree.

The search warrant authorized a search of the premises for documentary evidence as well as contraband. The affidavit incorporates the allegation in the original indictment against Defendants that they had conspired to manufacture and distribute methamphetamine from June 1999 until September 6, 2002, the date of the indictment. Officer Matthew Abowd's affidavit in support of the warrant added that in his experience investigating drug traffickers, they (1) use multiple cell phones, phone cards, and other telecommunications devices; (2) put property, bills, and other records in the names of others; (3) maintain business ledgers and bank and credit card statements; (4) keep recipes and receipts from ingredient purchases; and (5) possess pictures and videos of themselves and associates. He further stated that records of the conspiracy are often kept on traffickers' premises.

Here, the grand-jury indictment provided probable cause to believe that Defendants were drug traffickers, *see United States v. Killip*, 819 F.2d 1542, 1550

(10th Cir. 1987), and Abowd's experience, together with common sense, provided probable cause to believe that records of their crime could be found in their homes. *See United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in United States Currency* , 965 F.2d 868, 874 (10th Cir. 1992). Thus, there was probable cause to search Mook's house on North Garrison.

### E. Second Search of the North Garrison House and September 24, 2002, Search of Mook's Storage Lockers

Mook also challenges search warrants for (1) a second search of the house on September 23 and (2) the search of a storage locker on September 24. Mook's sole challenge to these searches is that the warrants were based on evidence discovered during the first September 23 search, which he contends was unconstitutional. Because we hold that search constitutional, we reject this challenge.

## III. The Conspiracy Charge

The grand jury indictment charged that each defendant had participated in a conspiracy with at least nine named members. Defendants contend that there was a fatal variance between the conspiracy charged and the proof at trial of multiple, smaller conspiracies among subsets of the persons named in the indictment. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *United States v. Ailsworth*, 138 F.3d 843, 848

-14-

(10th Cir. 1998) (internal citations and quotation marks omitted).  But not every variance requires reversal.  A "variance is reversible error only if it affects the substantial rights of the accused."  *Id.*

There are thus two questions:  First, was there sufficient evidence to support a finding of the single conspiracy charged, or was there a variance?  Second, if there was a variance, was that variance substantially prejudicial to Defendants?  We need not decide the first question here because we answer the second in the Government's favor.  Whether a variance was substantially prejudicial is a question of law that we review de novo.  *See United States v. Bryant*, 349 F.3d 1093, 1095 (8th Cir. 2003).  Even if there was a variance in this case, it was not substantially prejudicial to Defendants and consequently it is not a ground for reversing their convictions.

"A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment."  *United States v. Harrison*, 942 F.2d 751, 758 (10th Cir. 1991) (internal quotation marks omitted).  As we explained in *United States v. Williamson*, 53 F.3d 1500, 1512-13 (10th Cir. 1995), this proposition "follows from the fact that the prohibition against variances is designed to insure notice of the charges; thus, a variance, without more, will not

warrant relief as long as the proof corresponds to an offense clearly charged in the indictment because the defendant will have had notice of that charge and cannot claim prejudice." *Id*. at 1513.

Here, even if the evidence did not establish a single conspiracy including all nine alleged coconspirators, it clearly supported finding a conspiracy including the three Defendants to manufacture methamphetamine on the hill. In addition to the tangible evidence seized during various searches—including methamphetamine, ingredients and equipment for preparing methamphetamine, and records of the conspiracy—the prosecution offered direct testimony from several witnesses. Westcott's former wife Karen Heim, who lived on the hill with Westcott, testified that she repeatedly observed Windrix cooking methamphetamine with Mook, Westcott, and others in the back room of Windrix's trailer; she and Westcott purchased ingredients with money from Windrix; cooks took place two to five times per week; and Mook participated in cooks and purchased ingredients while living on the hill. Amanda Jean Pedone, a charged coconspirator, testified that she bought methamphetamine from the hill for distribution; she saw Windrix, Westcott, and Mook bury ingredients and Windrix bury cash—as much as $20,000—on the hill; she saw Mook and Westcott assist Windrix with cooks on the hill; and she saw Westcott destroy evidence such as empty bottles and run errands to procure ingredients. Ryan Brandy Langston, a

-16-

charged coconspirator, testified that he procured ingredients for cooks; participated in cooks with Windrix, Westcott, and Mook; distributed methamphetamine from the hill; and saw Westcott prepare for cooks and destroy evidence. Coni Johnson testified that she procured ingredients for Windrix and distributed methamphetamine from the hill. This conspiracy including at least the three Defendants but not necessarily all the persons named in the indictment is a "narrower scheme . . . fully included within the indictment." *Harrison*, 942 F.2d at 758. The conspiracy charge adequately notified Defendants of the nature of the crime alleged.

In *Harrison* we also said, however, that a variance may be substantially prejudicial "if the evidence adduced against co-[conspirators] involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt." *Id.* (internal quotation marks omitted) (brackets in original). Defendants allege such prejudice, pointing principally to the testimony of government witnesses Amanda Pedone, Coni Johnson, and Ryan Langston. Johnson, by her own testimony and Langston's, conspired separately with Ronnie Maynard to manufacture and distribute methamphetamine in Creek County. And Pedone testified to buying and selling methamphetamine from persons not associated with the hill conspiracy.

Windrix contends that (1) this testimony confused the jury, (2) the jury might have relied on it in convicting Defendants, and (3) the judge relied on evidence of non-hill-conspiracy manufacturing activities in making drug-quantity findings. Westcott raises the additional contentions that (1) although Windrix may have been connected with Johnson's non-hill-conspiracy manufacturing activities, Westcott was not; (2) the evidence established not only the hill conspiracy but separate uncharged drug activity by Westcott; and (3) Westcott was not involved, although others were, in using a minor to sell methamphetamine. And Mook further contends that there was not enough evidence to tie him even to the hill conspiracy, but only to a conspiracy "with respect to the alleged lab located on Mr. Mook's residence on North Garrison." Mook Aplt. Br. at 38.

These contentions are unpersuasive. As in *Harrison*, the evidence concerning any criminal activity outside the hill conspiracy "was sufficiently narrow and insignificant compared to the overwhelming evidence offered with respect to the [hill] conspiracy . . . that it is unlikely that any prejudicial spillover occurred at all." *Harrison*, 942 F.2d at 758. Indeed the jury was specifically instructed not to convict on the basis of conspiracies not charged, *see United States v. Wright*, 932 F.2d 868, 874–75 (10th Cir. 1991) (such an instruction safeguards against this type of prejudice), and the jury's capacity to

-18-

distinguish among the codefendants is demonstrated by its acquittal of codefendant Jimmy Ritz on all counts at the very trial at which Defendants were convicted. As we remand this case for resentencing in light of *Booker*, claims of prejudice stemming from the district court's drug-quantity findings are premature.

Because Defendants have shown neither that the indictment failed to give them proper notice of the crimes charged, nor that there was any significantly prejudicial spillover of evidence from conspiracies of which they were not members, we hold that even if there was a variance in this case, Defendants were not substantially prejudiced by it.

## IV. Westcott's Motion to Sever

The district court refused to sever Westcott's trial from that of the other defendants. We review the district court's refusal to sever for abuse of discretion. *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997). Westcott contends that his trial should have been severed because he was prejudiced by evidence relevant only to the activities of the other defendants—in particular, evidence of the same off-hill drug-related activities noted in the above discussion of Defendants' variance contention.

The district court did not abuse its discretion in denying the motion to sever. As we have already stated, Westcott's involvement with the conspiracy was sufficiently great that the evidence of other drug-related activities in which

coconspirators may have been involved was not unduly prejudicial.  And the evidence of Windrix's and Mook's hill-conspiracy-related activities was not unduly prejudicial because it could have been introduced in a separate trial of Westcott on a charge of participating in the hill conspiracy.  *See, e.g., United States v. Yazzie*, 188 F.3d 1178, 1193–94 (10th Cir. 1999) (aider and abettor not entitled to severance on the ground that evidence against murderer was particularly gruesome because same evidence could have been introduced in separate trial); *United States v. Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993) (lesser culpability of one defendant relative to others is not ground for reversing denial of request for severance) (collecting cases).

## V.  Jury-Wheel Composition

Westcott contends that the Northern District of Oklahoma's jury-selection scheme, *see* N.D. Okla. Civ. R. 47.1, which includes in the jury pool nonvoter licensed drivers in only one (the most urban) of the district's 11 counties, violated his right to trial by a jury chosen from a fair cross-section of the community. This right, Westcott contends, is guaranteed him by the Sixth Amendment and the Federal Jury Selection and Service Act of 1968 (FJA), 28 U.S.C. § 1861 *et seq*. The district court ruled that Westcott's motion asserting his fair-cross-section right was time-barred by 28 U.S.C. § 1867(a), which provides:

> In criminal cases, before the voir dire examination begins, or within
> seven days after the defendant discovered or could have discovered,

by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

The motion was filed on July 30, 2003, four days before trial. The Government says it should have been filed within seven days of appointment of counsel, the previous January 10.

Westcott has presented two arguments why his motion was timely. First, in response to a suggestion from the bench at oral argument, Westcott contended that his motion asserting a Sixth Amendment fair-cross-section right was not subject to the statutory time bar, which, in his view, applies only to statutory challenges. Perhaps § 1867(e)[1] should be so read. *Compare United States v. Cooper*, 733 F.2d 1360, 1366 (10th Cir. 1984) ("It has been held that 28 U.S.C. § 1867(e) provides the exclusive means for a party charged with a federal crime to challenge a jury."), and *United States v. Green*, 742 F.2d 609, 612 (11th Cir.

---

[1] 28 U.S.C. § 1867(e) states:

The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. Nothing in this section shall preclude any person . . . from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries.

1984) (applying prerequisites of § 1867 to constitutional claim) *with*

*United States v. Alba-Conrado*, 481 F.2d 1266, 1270 n.5 (5th Cir. 1973) (§ 1867 does not apply to constitutional challenge), and *United States v. Jones*, 687 F.2d 1265, 1269 (8th Cir. 1982) (same). *See also United States v. Pion*, 25 F.3d 18, 22 n.3 (1st Cir. 1994) (discussing but not resolving the issue). But we need not decide the matter, because Westcott did not argue in district court, or even in his briefs on appeal, that § 1867 does not govern his Sixth Amendment challenge, *see In re Walker*, 959 F.2d 894, 896 (10th Cir. 1992) (in general we will not consider an argument not raised below), and he does not argue on appeal that any special circumstance requires us to address this contention despite lack of preservation below.

Westcott's second response to the Government's time-bar contention is that his fair-cross-section motion was timely under the statute. The statute permits filing "within seven days after the defendant discovered or could have discovered [the factual basis for his motion] by the exercise of diligence." 28 U.S.C. § 1867(a). He claims that his attorney discovered the local rule concerning jury selection only the day before he filed the motion. We are not persuaded.

The allegedly illegal jury-selection procedures appear in a local civil rule referenced by a local criminal rule. Westcott points out that his attorney was a criminal-law specialist and hence not familiar with the jury-selection procedures

in the local civil rules. The district court, however, found that Westcott's attorney should have known about the jury-selection procedures because they apply to all criminal cases and are referenced by the local criminal rules, and that consequently Westcott had seven days from the appointment of his attorney to make his motion.

We are basically in agreement with the district court. Westcott's attorney was charged with knowledge of the local criminal rules in their entirety, including those parts of the local civil rules incorporated by reference. *See United States v. Rourke*, 984 F.2d 1063, 1066 n.3 (10th Cir. 1992) (charging criminal defendant with knowledge that illegal sentence can be corrected under Fed. R. Crim. Proc. 35); *Jetton v. McDonnell Douglas Corp.*, 121 F.3d 423, 426 (8th Cir. 1997) (charging party with knowledge of local rules). That a party may be harmed by its attorney's neglect of a local rule is an accepted consequence of our system of representative litigation. *See United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004) (criminal defendant lost opportunity to appeal because counsel confused civil and criminal appeal deadlines). We hold that Westcott "could have discovered, by the exercise of diligence" the ground of his fair-cross-section claim long before his motion was filed. Accordingly, it was time-barred.

Westcott also contends that he was entitled to certain jury-pool records. His pretrial motion sought the records "to determine the number of potential

jurors taken from voter lists and/or Driver's license lists." R. vol. IV, doc. 371 at 10. But because his motion on the merits was time-barred, any error in denying him access to the records that might have supported his motion was harmless.

## VI.    Sentencing Issues

Each Defendant had his sentence enhanced under the Sentencing Guidelines on the basis of judge-found facts. The indictment charged a conspiracy involving 50 grams or more of actual methamphetamine or 500 grams or more of a mixture. That amount of methamphetamine results in a guidelines base offense level of 32. U.S. Sentencing Guidelines Manual § 2D1.1(c)(4) (2004). (Mook contends that the appropriate level was 30 because a level of 32 requires *more than* 50 grams of actual methamphetamine or *more than* 500 grams of mixture. But he is incorrect. The guidelines result in a base offense level of 32 for "[a]t least 500 G but less than 1.5 KG of Methamphetamine, or at least 50 G but less than 150 G of Methamphetamine (actual)." *Id.*)

Windrix was in criminal-history category I. The indictment drug quantities and this criminal history lead to a guidelines range of 121-151 months' imprisonment. *Id.*, ch. 5, pt. A, Sentencing Table. But the district court found Windrix responsible for 1.927 kilograms of actual methamphetamine, resulting in a base offense level of 38. *Id.* § 2D1.1(c)(1). The court also applied a 2-level enhancement for possession of a firearm, *id.* § 2D1.1(b)(1), and a 4-level

enhancement for leading a criminal group of five or more, *id.* § 3B1.1(a). The total offense level was thus the guidelines maximum of 43, for which the guidelines prescribe life imprisonment. *Id.,* ch. 5, pt. A, Sentencing Table.

Mook was in criminal-history category III. The indictment drug quantities and this criminal history lead to a guidelines range of 151-188 months' imprisonment. *Id.* But the district court found Mook responsible for 1.84 kilograms of actual methamphetamine, resulting in a base offense level of 38. *Id.* § 2D1.1(c)(1). The court also applied a 2-level enhancement for possession of a firearm. *Id.* § 2D1.1(b)(1). The total offense level was thus 40, for which the guidelines prescribe 360 months' to life imprisonment. *Id.*, ch. 5, pt. A, Sentencing Table.

Westcott was in criminal-history category V. The indictment drug quantities and his criminal history lead to a guidelines range of 188–235 months' imprisonment. *Id.* But the district court found Westcott responsible for 1.927 kilograms of actual methamphetamine, resulting in a base offense level of 38. *Id.* § 2D1.1(c)(1). For this the guidelines prescribe 360 months to life imprisonment. *Id.* ch. 5, pt. A, Sentencing Table.

Defendants objected to the enhancements to their offense levels as based on facts not found by the jury, contending that they were contrary to the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Mook's counsel

made the objection during a joint presentation of objections by all defense counsel. The objection was adequately preserved below.

*United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005), teaches that Defendants were correct. The district court violated the Sixth Amendment by making findings of fact that increased the mandatory sentencing ranges. *Id.* at 748–49 (Op. of Stevens, J.). Thus, reversal is required unless the error was harmless. *See United States v. Riccardi*, 2005 WL 896430 at *19-20 (10th Cir. Apr. 19, 2005) .

Harmless-error review stems from Federal Rule of Criminal Procedure 52(a), which provides that "[a]ny error . . . that does not affect substantial rights must be disregarded." The Government concedes that to prevail on harmless-error review in this case it "must prove the error is harmless beyond a reasonable doubt." Gov't Supp. Br. at 15 (*citing Neder v. United States*, 527 U.S. 1, 15 (1999)). The Government, which takes the position that Defendants did not preserve their *Booker* objection, spends most of its brief addressing plain error. The whole of its one-paragraph argument on harmless error is that Defendants' guidelines offense level was supported by the evidence and resulted in a sentence less than the statutory maximum. The Government has failed to present evidence to convince us beyond a reasonable doubt that the district court would have imposed just as harsh a sentence in the absence of a mandatory guideline regime.

Thus, we must set aside the Defendants' sentences and remand for resentencing. We need not resolve their challenges to the district court's application of the Sentencing Guidelines. We do, however, think it may be useful to the district court to note a concern regarding the determination of the purity of the methamphetamine prepared by Defendants. No chemical analysis of purity was performed on any sample. Because the conspiracy's methamphetamine was uncut, the district court apparently inferred that the methamphetamine was pure. This inference may be incorrect. *See United States v. Mesner*, 377 F.3d 849, 850 (8th Cir. 2004) (methamphetamine found at laboratory was 15–19% pure); *United States v. Houston*, 338 F.3d 876, 881–83 (8th Cir. 2003).

## VII. Conclusion

We AFFIRM Defendants' convictions but REMAND for resentencing in light of *Booker*.